*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2014 UT 10**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

CODY LYNN NIELSEN,
*Defendant and Appellant.*

No. 20080709
Filed April 29, 2014

First District, Logan Dep't
The Honorable Clint S. Judkins
No. 011100412

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen.,
Salt Lake City, Tony C. Baird, Logan, for appellee

Craig T. Peterson, Bountiful, for appellant

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1   Cody Nielsen was convicted of the aggravated murder of
Trisha Autry and sentenced to life without parole. On this appeal,
Nielsen raises a series of challenges to the venue for his trial—a
Cache County trial with a jury comprised of Box Elder County
residents. He also questions the sufficiency of the evidence to sus-
tain lesser offenses of kidnapping and aggravated kidnapping and
the sufficiency of the evidence to sustain his bindover for trial on
aggravated murder. Finally, he asserts that his convictions for
kidnapping and desecration of a body should have merged with
his conviction of aggravated murder, necessitating vacatur of the-
se lesser offenses.

¶2   We affirm Nielsen's conviction of and sentence for aggravated murder and desecration of a body, but reverse and vacate his kidnapping and aggravated kidnapping convictions on merger grounds.

I

¶3   On the morning of June 24, 2000, fifteen-year-old Trisha Autry disappeared from her home in Hyrum, Utah. Her disappearance remained a mystery for nearly a year, until the remains of her body and clothing were discovered buried in a hole at the U.S.D.A. Predator Research Facility in the nearby town of Millville. Nielsen, an employee at the Predator Facility, was eventually arrested and charged with her murder.

¶4   According to the evidence gathered by law enforcement, Nielsen first met Trisha in April of 2000. She was walking home from school with a friend when he passed them in his truck several times. He eventually pulled up and began talking to them. Nielsen gave them his pager number, and told them to call him if they "ever want[ed] to go do something, party, drink, whatever."

¶5   A few days later, Trisha was walking home with a different friend when Nielsen's truck passed them again. Trisha's friend testified that Trisha became agitated, and told her that the man in the truck—whom she called "Sam"—had been following her and calling her at home. The two girls ran away from the truck when it passed again, and were eventually picked up by their neighbor. The neighbor testified that the girls were "pretty nervous." After this second incident, Trisha began calling home after school "pretty much every day" and asking her family members to come and pick her up so that she wouldn't have to walk home.

¶6   Trisha's mother awoke early on the morning of June 24 and discovered that Trisha was not in her bedroom. After the family failed to find her, Trisha's mother called the police to report Trisha missing at about 6:30 a.m.

¶7   In Trisha's room, her mother noticed that many of Trisha's belongings were missing: the clothing she had worn the previous day, a pair of old tennis shoes that Trisha didn't like, and a bra that she only wore when sleeping. The missing clothes led her mother to deduce that she hadn't left to meet anyone, because Trisha would have changed into clean clothes, and only wore dirty clothes "if she wasn't going anywhere." Based on this and other

evidence, Trisha's mother concluded that she had gone for a solitary walk. The immediate investigation into Trisha's disappearance failed to produce any information on her whereabouts.

¶8 A few weeks earlier, in late May or early June of 2000, one of Nielsen's coworkers, William Pitt, noticed Nielsen digging a large hole on the grounds of the Predator Facility, using a backhoe and grader that he used in his job at the facility. When Pitt asked him about the hole, Nielsen told him he wanted to "see how deep of a hole he could dig" with the backhoe. Pitt told Nielsen to fill the hole because it was a safety hazard. In the following months, Pitt and another employee, Doris Zemlicka, observed Nielsen digging around the area with a backhoe, creating a large pile of trash and debris in and on the now-filled-in hole. Eventually they noticed that Nielsen burned the pile of trash and debris over the course of an entire day.

¶9 Almost one year later, the efforts of a private investigator led police to identify Nielsen as a suspect in Trisha's disappearance and to home in on the Predator Facility. Cadaver dogs were brought in as an element of a search of the facility. The dogs alerted on the area of the hole dug by Nielsen. In the ensuing excavation, law enforcement discovered a part of Trisha's jawbone, several hundred other bone fragments, her shoes, bra, and part of the waistband of her underwear. The police interviewed Nielsen, who admitted that he had met Trisha and sometimes went by the nickname "Sam." Under further questioning, Nielsen neither admitted nor denied that he killed Trisha.

¶10 Nielsen was charged with aggravated murder, obstruction of justice, and desecration of a dead body. After a preliminary hearing, the trial court bound him over as charged. Nielsen subsequently filed a motion for a change of venue—from Cache County to Davis County—asserting a potential for jury bias against him due to extensive pretrial publicity in Cache County. The State did not oppose the motion, which was granted by the trial court.

¶11 For reasons unclear from the record, the trial court did not immediately transfer the case to Davis County. Instead, ongoing pretrial proceedings continued in Cache County. About a year later, in September 2002, defense counsel raised the venue issue

again, this time seeking a trial in Box Elder County instead of Davis. Again, the State did not object, and the trial court agreed.

¶12  Again, however, the case was not immediately transferred. Instead, the parties' attention turned to concerns regarding the size and security of the courtroom facilities in Box Elder County. In light of these concerns, the State suggested that the trial be held in Cache County; the defense objected. Ultimately, the trial court ordered that the trial be held in Cache County, but with jurors chosen in and transported from Box Elder County.

¶13 Before trial, the prosecution amended the information, charging Nielsen with one count of aggravated murder, two counts of desecration of a human body, one count of aggravated kidnapping, and one count of kidnapping. At trial, after the State had concluded its case-in-chief, the defense moved for a directed verdict on all five charges. The trial court denied the motion.

¶14  The jury ultimately convicted Nielsen as charged, finding that the kidnapping and aggravated kidnapping charges served as the statutory aggravators required to sustain the aggravated murder charge. The trial court noted that kidnapping was a lesser-included offense of aggravated kidnapping, however, and ruled that the kidnapping conviction should merge into aggravated kidnapping. For reasons unclear on the record, however, the court's final judgment failed to reflect the ruling on merger — indicating instead that Nielsen was convicted on both the kidnapping and aggravated kidnapping charges.

¶15  After returning its verdict, the jury also heard evidence that Nielsen had been previously convicted of assault. At the time the crime was committed, a prior felony conviction involving "the use or threat of violence to a person" was a statutory aggravator for aggravated murder. UTAH CODE § 76-5-202(1)(h) (2000). But although Nielsen had been charged and convicted on a felony assault charge, the conviction had been statutorily reduced to a class A misdemeanor under Utah Code section 76-3-402. The jury received a copy of the criminal record and concluded that Nielsen's crime was a felony involving the use of violence, and considered it as a statutory aggravator for sentencing purposes.

¶16  Nielsen's aggravated murder conviction triggered the capital sentencing statute. UTAH CODE § 76-3-207. Under that statute, the jury exercises wide discretion when determining what sen-

4

tence to impose, and can consider "any . . . facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence." *Id.* § 76-3-207(2)(1)(iv). Of the three possible sentences that the jury could have imposed (life, life without the possibility of parole, and death), the jury sentenced Nielsen to life without the possibility of parole. He was also sentenced to fifteen years to life in prison for the aggravated kidnapping charge and up to five years in prison for each count of desecration of a human body. His sentences were to run consecutively.

¶17 Nielsen filed a timely motion for new trial in April 2004. For reasons not entirely clear from the record, that motion was left pending—without Nielsen ever submitting a memorandum in support and without any ruling disposing of the motion—for over four years. Eventually, in July 2008, the district court issued two separate orders finally disposing of Nielsen's pending motion. Nielsen filed two separate notices of appeal, each within thirty days of the district court's orders.

¶18 The parties appear to concede the timeliness of Nielsen's appeal, and we see no reason to disagree. Under rule 4(b)(1) of the Utah Rules of Appellate Procedure, the thirty-day period for Nielsen's notice of appeal was to "run[] from the entry of the [district court's] order disposing of the motion" for new trial. It appears from the record that the trial court did not "dispos[e] of" the motion until July 2008, so we conclude that Nielsen filed a timely notice of appeal preserving our appellate jurisdiction.

II

¶19 On appeal, Nielsen challenges his convictions and sentences on several grounds. First, he asserts a range of errors related to venue issues—asserting plain error by the district court and/or ineffective assistance of counsel in connection with the failure to transfer the case to Davis County, the subsequent consideration of a transfer to Box Elder County, and the ultimate determination to try the case in Cache County with Box Elder jurors. Second, Nielsen appeals the denial of his motion for directed verdict on the kidnapping charge, asserting that there was insufficient evidence on an essential element of that crime. Third, Nielsen challenges the sufficiency of the evidence to bind him over for trial on the charge of aggravated murder. And finally, he appeals his convictions for aggravated kidnapping, kidnapping, and desecration of

a body on merger grounds, asserting that these crimes should have merged into the aggravated murder conviction.

¶20 We affirm Nielsen's convictions and sentences for aggravated murder and desecration of a body, but reverse and vacate his convictions for kidnapping and aggravated kidnapping on merger grounds.

## A. Venue Issues

¶21 Nielsen asserts a series of challenges to the various venue determinations made by the district court—in the failure to transfer the case to Davis County while later determining to transfer the case to Box Elder County, and also in holding the trial in Cache County with Box Elder jurors. The first of these challenges was unpreserved in the district court, and comes before us on Nielsen's assertion of ineffective assistance of counsel and plain error. The latter challenge was preserved below. We affirm, rejecting the first set of venue arguments based on Nielsen's failure to establish prejudice and rejecting the last on the merits.

### 1. Failure to transfer to Davis County

¶22 When the district court granted Nielsen's motion to transfer venue to Davis County, the judge was required by statute to transfer the case for trial to the transferee court. UTAH CODE § 78-13-10 (2001). By rule, the transfer of "all documents of record concerning the case" was to be effected "without delay." UTAH R. CRIM. P. 29(e). Nielsen asserts plain error in the district court's failure to do so, and claims that his trial counsel was ineffective in not raising this issue below. He also asserts parallel challenges to the subsequent determination to transfer the case to Box Elder County, claiming both plain error and ineffective assistance in not abiding by the initial decision to transfer to Davis County.

¶23 We reject both claims for lack of proof of prejudice. Nielsen's only assertion of harm from the district court's failure to promptly transfer the case to Davis County is the notion that "the defendant was tried by a jury who was selected from a county that had extensive prejudicial media coverage of the alleged crimes and bused the short distance to the county where the alleged crimes took place." That is insufficient. Where the alleged harm is a tainted jury in a trial that has already taken place, the question is not a mere likelihood of bias in the jury venire; it is actual bias on the part of the jurors who actually sat. *Lafferty v. State*,

2007 UT 73, ¶ 42, 175 P.3d 530. Nielsen has made no such show-ing. He has asserted that pretrial publicity might have tainted the jury venire, while conceding that he has no evidence of actual bias on the part of any actual juror.

¶24  Nielsen's lack of proof of such prejudice foils his claims of plain error and ineffective assistance of counsel. A claim of plain error fails in the absence of proof that an error is harmful — in the sense of having a "reasonable likelihood" of affecting the out-come. *State v. Harris*, 2012 UT 77, ¶ 24, 289 P.3d 591. The same goes for a claim of ineffective assistance of counsel. Such a claim requires a showing both "that counsel's performance was defi-cient" and that "the deficient performance prejudiced the de-fense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, even assuming that the court's failure to transfer was error and that counsel was deficient in failing to raise the issue, Nielsen's claims fail absent any salient showing of prejudice.

### 2. Holding trial in Cache County with Box Elder jurors

¶25  In December 2003, over two years after Nielsen was first charged, the trial judge decided to hold the trial in Cache County due to security and logistical concerns relating to the courthouse in Box Elder County. To minimize the risk of any potential bias resulting from pretrial publicity, however, the judge also deter-mined to convene a jury from a venire consisting of residents of neighboring Box Elder County.

¶26  Nielsen challenges the trial judge's decision overruling his objection to these determinations. He bears a heavy burden in so doing. The law leaves decisions regarding venue transfer largely in the discretion of the trial judge. *See City of Grantsville v. Redev. Agency*, 2010 UT 38, ¶ 53, 233 P.3d 461. We overturn discretionary judgments on such matters only in the rare case of an abuse of discretion. *Id.*

¶27  We see no abuse of discretion here. Nielsen's principal claim of an abuse of discretion is his speculation that a jury as-sembled in Cache County may have felt "undue pressure . . . to make a decision they may not otherwise make, if they were free from all of that over in Box Elder County." But as we noted in the *City of Grantsville* case, trial judges act well within the broad bounds of their discretion in denying venue transfer motions in the face of "allegations of bias . . . based on general apprehensions

based upon conjecture." 2010 UT 38, ¶ 53 (internal quotation marks omitted). That conclusion is clearer where the defense has the opportunity to "weed out potentially biased jurors" during voir dire proceedings, *id.*, and even more so where the court took the additional step of busing jurors from a neighboring county.

¶28 We cannot conclude that the judge's decisions were so arbitrary and capricious that "no reasonable [person] would take the view adopted by the trial court." *State v. Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133 (alteration in original) (internal quotation marks omitted). Granted, other alternatives for dealing with Nielsen's concerns regarding pretrial publicity were also available. The judge could have held the trial in a different venue, such as Davis County, for example. But the existence of other alternatives does not make the one selected by the judge an irrational one. And we accordingly affirm because we deem his chosen approach a reasonable one among many.

### B. Sufficiency of the Evidence on Kidnapping Convictions

¶29 Nielsen's challenge to his kidnapping and aggravated kidnapping convictions sets its sights on the denial of his motion for directed verdict. He argues that there was insufficient evidence for a reasonable jury to decide beyond a reasonable doubt that Trisha went with Nielsen against her will, a necessary element of kidnapping (and thus also an element of aggravated kidnapping). UTAH CODE §§ 76-5-301, –302.

¶30 The applicable standard of review is again highly deferential. In assessing a claim of insufficiency of the evidence, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (internal quotation marks omitted). We reverse "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (internal quotation marks omitted).

¶31 In attempting to carry that heavy burden, Nielsen sweepingly asserts that the State "produced no direct evidence on the victim's unwillingness to go with the defendant, and the best circumstantial evidence that they could come up with was that the victim might have been leery or scared of the defendant." The

8

State offers two lines of response. First it asks us to stop short of reaching the merits in light of Nielsen's purported failure to marshal the evidence—specifically, his failure to present, "in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists." *Chen v. Stewart*, 2004 UT 82, ¶ 77, 100 P.3d 1177 (internal quotation marks omitted). Second, and alternatively, the State challenges Nielsen's position on the merits, identifying evidence in the record that it sees as sufficient to sustain an inference that Trisha was taken against her will.

¶32 We reject the State's first point but agree with its second. Before addressing the merits of Nielsen's challenge to the sufficiency of the evidence, we first consider the State's marshaling argument—acknowledging some dicta in our prior cases that appears to support it, but refining and clarifying the standard going forward.

### 1. Marshaling

¶33 Our rules of appellate procedure prescribe standards for the form, organization, and content of a brief on appeal. *See* UTAH R. APP. P. 24. Some of the standards in rule 24 are sufficiently clear and objective that the failure to follow them may result in the rejection of a noncompliant brief by our clerk's office. A brief that exceeds the rule's limits on length, for example, would be rejected by our clerk's office, as would a brief that fails to include a table of contents or statement of the standard of review. *See id.* 24(a)(2), (5). Typically a party filing a noncompliant brief would be given an opportunity to correct these sorts of deficiencies. But failure to do so theoretically could result in our failure to reach the merits on the basis of the party's procedural default under rule 24.

¶34 Other standards in rule 24 are more subjective, and not susceptible to rejection by the clerk's office or to procedural default by the court. Such standards are often an outgrowth of a party's burden of persuasion on appeal. Thus, rule 24 requires the appellant's brief to set forth "the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on." *Id.* 24(a)(9). Our clerk's office makes no attempt to police this rule at the outset. That assessment is left to the court. And we perform it not as a matter of gauging procedural compliance with the rule, but as a necessary component of our evaluation of the case on its

merits, as viewed through the lens of the applicable standard of review. *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) ("While failure to cite to pertinent authority may not always render an issue inadequately briefed, it does so when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court."); *Salt Lake Cnty. v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 37 n.5, 297 P.3d 38 (holding that the appellant "has not met its burden of persuasion on appeal by adequately briefing a plausible claim").

¶35 Historically, our marshaling requirement was understood to fall into the latter category. For many years, we conceived of the responsibility to marshal the evidence supporting a challenged factual finding as a mere component of an appellant's broader burden of overcoming the weighty deference granted to factual determinations in the trial court. Thus, when a party failed to marshal and distinguish evidence supportive of a challenged verdict or finding of fact, our response was not to decline to reach the merits as a matter of default, but simply to affirm on the ground that the appellant had failed to carry its heavy burden of persuasion.

¶36 This version of the marshaling principle was announced in our cases as early as 1961. *See Charlton v. Hackett*, 360 P.2d 176, 176 (Utah 1961). We followed this approach consistently for several decades thereafter. *See, e.g., Nyman v. Cedar City*, 361 P.2d 1114, 1115 (Utah 1961); *Egbert & Jaynes v. R.C. Tolman Constr. Co.*, 680 P.2d 746, 747 (Utah 1984). We coined the term "marshal[ing]" in 1985, *see Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985), but still continued to view marshaling as part of the overall burden necessary to meet the clear error standard of review on appeal. *See, e.g., IFG Leasing Co. v. Gordon*, 776 P.2d 607, 616–17 (Utah 1989).

¶37 Over time our caselaw occasionally has migrated in the other direction—toward the hard-and-fast *default* notion of a procedural rule. Instead of noting an appellant's failure to marshal as a step toward concluding that it had failed to establish clear error, we sometimes have identified a marshaling deficiency as a ground for an appellant's procedural default—citing a lack of marshaling as a basis for not reaching the merits. *See, e.g., United Park City Mines Co. v. Stichting Mayflower Mountain Fonds*, 2006 UT 35, ¶¶ 38, 41, 140 P.3d 1200.

¶38 Over a similar span of time, we also added some additional teeth to the rule. Thus, while rule 24(a)(9) itself (adopted in 1999) speaks only of "marshal[ing] all record evidence that supports the challenged finding," our caselaw has sometimes extended this principle to require an appellant to "present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists," and to do so in a manner in which he "temporarily remove[s] [his] own prejudices and fully embrace[s] the adversary's position" by assuming the role of "devil's advocate." *Chen*, 2004 UT 82, ¶¶ 77–78 (internal quotation marks omitted).

¶39 Our commitment to the hard-and-fast default notion of the marshaling rule has been less than complete. Sometimes we have openly overlooked a failure to marshal and proceeded to the merits. *See, e.g., State v. Green*, 2005 UT 9, ¶¶ 12–13, 108 P.3d 710. In many other cases, moreover, we have reverted to our earlier conception of marshaling, and disposed of the case on its merits despite an alleged failure to marshal "every scrap" of contrary evidence. And in all events we have declined to state a limiting principle, leaving the question of whether to treat marshaling as a basis for a default or instead as a component of the burden of persuasion purely a matter of our discretion. *See Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶¶ 19–20, 164 P.3d 384 (noting that parties risk forfeiting their challenges to factual questions when they fail to marshal but sustaining the court of appeals' choice to resolve the case on its merits because "[t]he reviewing court . . . retains discretion to consider independently the whole record and determine if the decision below has adequate factual support").

¶40 The time has come to reconcile and regularize our cases in this field. In so doing, we recognize and reiterate the importance of the requirement of marshaling. It is a boon to both judicial economy and fairness to the parties. *See Chen*, 2004 UT 82, ¶ 79. Thus, an appellant who seeks to prevail in challenging the sufficiency of the evidence to support a factual finding or a verdict on appeal should follow the dictates of rule 24(a)(9), as a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues. That said, we now conclude that the hard-and-fast default notion of marshaling is more problematic than helpful — particularly when compounded by the heightened requirements of our caselaw (to present "every scrap" of evidence and to play "devil's advocate") and our retention of

discretion to disregard a marshaling defect where we deem it appropriate.

¶41 We therefore repudiate the default notion of marshaling sometimes put forward in our cases and reaffirm the traditional principle of marshaling as a natural extension of an appellant's burden of persuasion. Accordingly, from here on our analysis will be focused on the ultimate question of whether the appellant has established a basis for overcoming the healthy dose of deference owed to factual findings and jury verdicts—and not on whether there is a technical deficiency in marshaling meriting a default.

¶42 In so holding, we do not mean to minimize the significance of our longstanding requirement of marshaling. Instead we aim only to clarify it and put it in proper perspective. Thus, we reiterate that a party challenging a factual finding or sufficiency of the evidence to support a verdict will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal. Our point is only that that will be the question on appeal going forward. The focus should be on the merits, not on some arguable deficiency in the appellant's duty of marshaling.

¶43 Too often, the appellee's brief is focused on this latter point, and not enough on the ultimate merits of the case. To encourage the latter and discourage the former, we also hereby repudiate the requirements of playing "devil's advocate" and of presenting "every scrap of competent evidence" in a "comprehensive and fastidious order." *Supra* ¶ 38. That formulation is nowhere required in the rule. And its principal impact on briefing has been to incentivize appellees to conduct a fastidious review of the record in the hope of identifying a scrap of evidence the appellant may have overlooked. That is not the point of the marshaling rule, and will no longer be an element of our consideration of it.

¶44 Under this standard as now clarified, we reject the State's request that we treat Nielsen's failure to marshal every scrap of evidence supporting the jury's verdict as a stand-alone basis for rejecting his challenge to his kidnapping conviction. We proceed instead to the merits of Nielsen's argument, while emphasizing that our assessment of his claim on appeal is certainly affected (and greatly undermined) by the overbroad assertions in his brief regarding the absence of evidence in the record and by his general failure to identify and deal with that evidence.

### 2. Sufficiency of the evidence

¶45 Nielsen vastly undersold the record evidence supporting his conviction of kidnapping. The evidence was largely circumstantial. But it was nonetheless sufficient.

¶46 When we consider an insufficiency of the evidence claim, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *Maestas*, 2012 UT 46, ¶ 302 (internal quotation marks omitted). We may reverse a verdict "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (internal quotation marks omitted).

¶47 Nielsen challenges the verdict on kidnapping with the sweeping assertion that "the state produced no direct evidence on the victim's unwillingness to go with the defendant, and the best circumstantial evidence that they could come up with was that the victim might have been leery or scared of the defendant." That assertion falls far short under the above-noted deferential standard of review. Direct evidence is not required. Sustainable verdicts are entered every day on the sole basis of circumstantial evidence. *State v. John*, 586 P.2d 410, 411–12 (Utah 1978) (noting that circumstantial evidence "is recognized as a valid method of ascertaining the truth").[1] And where the jury returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict.

---

[1] *See also United States v. Langford*, 647 F.3d 1309, 1319 (11th Cir. 2011) ("[C]ircumstantial evidence may be used to establish an element of a crime, even if the jury could draw more than one reasonable inference from the circumstantial evidence, and in judging sufficiency of the evidence, we apply the same standard whether the evidence is direct or circumstantial."); *State v. Mitchell*, 343 S.W.3d 381, 391 (Tenn. 2011) ("The standard of review is the same whether the conviction is based upon direct or circumstantial evidence, or a combination of both.") (internal quotation marks omitted); *State v. Bonner*, 955 A.2d 625, 635 (Conn. App. Ct. 2008) ("[I]t does not diminish the probative force of the evidence that consists, in whole or in part, of evidence that is circumstantial rather than direct.") (internal quotation marks omitted).

¶48 That is certainly the case here. The jury heard testimony that Nielsen repeatedly followed Trisha home from school; that Trisha consistently responded to this attention with fear, which she expressed to her friends, church leader, mother, and sister; that she repeatedly asked to be picked up from school rather than walk home because she was afraid of Nielsen; that on the morning of her disappearance, she was wearing clothing that she would not have worn if she had intended to meet someone on her walk; and that Trisha's remains showed signs of blunt force injuries inflicted before her death.

¶49 All of this is relevant circumstantial evidence suggesting that Trisha would not have willingly gone anywhere with Nielsen. And we must view that evidence "and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *Maestas*, 2012 UT 46, ¶ 177 (internal quotation marks omitted). We accordingly affirm, as we cannot conclude in light of this evidence that "reasonable minds must have entertained a reasonable doubt" about the essential elements of the kidnapping charge. *Id.* (internal quotation marks omitted).

## C. Bindover on the Aggravated Murder Charge

¶50 In challenging the bindover on the aggravated murder charge, Nielsen asserts that there was no evidence of any aggravating elements presented at the preliminary hearing—specifically, that there was no evidence to suggest that Trisha was taken unwillingly, in a manner supporting the kidnapping aggravator. This claim overlaps substantially with the one addressed to the sufficiency of the evidence to support the kidnapping conviction, addressed above. *Supra* ¶¶ 45–49. But Nielsen's focus here is on the sufficiency of the circumstantial evidence presented at the preliminary hearing, and on the decision to bind him over for trial.

¶51 We affirm. The evidentiary standard on bindover is low. All that is required is "believable evidence of all the elements of the crime charged." *State v. Clark*, 2001 UT 9, ¶ 15, 20 P.3d 300 (internal quotation marks omitted). And the magistrate's assessment of that evidence is deferential, viewed in the light most favorable to the prosecution and with all reasonable inferences given to the prosecution. *Id.* ¶ 10.

¶52 The circumstantial evidence presented at the preliminary hearing appears to be the same circumstantial evidence presented

to the jury. Thus, our rejection of Nielsen's challenge to his kidnapping conviction necessarily requires the rejection of his challenge to the magistrate's bindover decision. That is because the evidentiary standard at bindover is much lower than it is at trial. If there was enough evidence to convict Nielsen beyond a reasonable doubt, there was certainly enough evidence to sustain the bindover decision. This is consistent with our general rule that any alleged defect in a bindover decision is cured by a subsequent guilty verdict on the same charge, foreclosing an appeal on the bindover decision. *Thomas v. State*, 2002 UT 128, ¶ 7, 63 P.3d 672 ("[A]n error at the preliminary stage is cured if the defendant is later convicted beyond a reasonable doubt.") (internal quotation marks omitted); *State v. Morgan*, 2001 UT 87, ¶ 7 n.1, 34 P.3d 767 ("[C]onviction renders any defect [in a bindover order] moot.").

## D. Merger

¶53 Nielsen's last set of claims concern the doctrine of merger. First, he claims that his kidnapping conviction merged with his conviction on aggravated kidnapping, and that the former conviction should accordingly be vacated. Second, he also contends that his convictions on aggravated kidnapping, kidnapping, and on two counts of desecration of a body merged into his aggravated murder conviction, and should likewise be vacated.

¶54 The State confesses error as to the kidnapping conviction. It acknowledges that kidnapping and aggravated kidnapping merged, and thus that the former should have been vacated. On that charge we accordingly reverse and remand to allow the conceded error to be corrected.

¶55 That leaves the question whether desecration of a body and aggravated kidnapping were lesser-included offenses that merged with the aggravated murder conviction. This question was not preserved below, so it comes to us on plain error review. To reverse on plain error grounds we would have to conclude that there was an error, that the error was obvious, and that the error was prejudicial. *Harris*, 2012 UT 77, ¶ 24. We reverse and vacate the aggravated kidnapping conviction on plain error grounds, but affirm the sentence of life without parole on the aggravated murder conviction in light of Nielsen's failure to articulate any concrete grounds for concluding that the merger error prejudiced his sentence.

¶56 Upon careful review of the record, it is apparent that only the kidnapping convictions—and not the desecration counts— were presented as aggravators at the guilt stage. Desecration of a human body did not qualify as a statutory aggravator under the law at the time of defendant's crimes, Utah Code section 76-5-202(1) (2000), and it was not presented to the jury as such. Evidence of Nielsen's prior assault conviction was introduced to the jury *after* it had convicted Nielsen of aggravated murder.[2] Thus, the only statutory aggravators at issue when the jury was deciding whether Nielsen was guilty of aggravated murder were the kidnapping charges.

¶57 Because the desecration counts do not implicate the doctrine of merger, the only merger question presented is whether Nielsen's aggravated kidnapping charge merged with his aggravated murder conviction. As Nielsen indicates, our cases sustain the conclusion that these two crimes should properly have merged. *See State v. Shaffer*, 725 P.2d 1301, 1312–14 (Utah 1986) (aggravated robbery merges with aggravated murder where the former is predicate offense offered as sole aggravator sustaining

---

[2] Nielsen alludes generally to a concern regarding the propriety of the sentencing jury's consideration of his prior assault conviction as an aggravator in the form of a conviction for a violent felony, noting that by the time of sentencing that felony had been "reduced to a class A misdemeanor under Utah Code . . . 76-3-402." But he stops short of asserting that point as a ground for questioning his sentence on aggravated murder. Instead he raises the point only as a lead-in to his conclusion that the prior assault conviction should not be assumed to have been "used as the aggravating circumstance that was an essential element in proving aggravated murder." We agree with Nielsen on that point, which seems apparent given that the prior violent felony was not even introduced to the jury until after the guilt phase. Thus, we do not and need not reach a legal question that has not been presented by Nielsen and is not properly before us, which is whether a past crime's status as a "convict[ion]" of a "felony involving the use or threat of violence to a person" under Utah Code section 76-5-202(1)(h) (2000) is to be assessed as of the time of the original conviction or should instead be reassessed in light of a subsequent reduction under Utah Code section 76-3-402.

the latter conviction); *State v. Ross*, 2007 UT 89, ¶ 61, 174 P.3d 628 (holding that "an underlying felony that constitutes the aggravating circumstance merges with the conviction for aggravated murder"). The principle established in *Shaffer* and *Ross* is precisely applicable here. Because the aggravated kidnapping conviction was the sole aggravator presented to the jury at the guilt phase, the aggravated kidnapping offense was "established by proof of the same or less than all the facts required to establish the commission of the offense charged." UTAH CODE § 76-1-402(3)(a). For that reason Nielsen's aggravated kidnapping conviction should have merged with his aggravated murder conviction.

¶58 The failure to identify this problem was a clear error. Our caselaw on the merger of predicate offenses with aggravated crimes is clear and well-established. And given that the merger problem is straightforward (not fact-intensive or complex) and could not conceivably have been ignored on strategic grounds, we deem it sufficient to sustain the conclusion that it should have been obvious to the court and parties below. *See State v. Gornick*, 130 P.3d 780, 783 (Or. 2006) (identifying the following considerations as suggesting that an error is "plain": that the error is one of law; that it is "obvious, not reasonably in dispute"; that it "appears on the face of the record," meaning that the reviewing court does not need to "go outside the record to identify the error or choose between competing inferences," such as a strategy of the parties; and that "the facts constituting the error are irrefutable") (internal quotation marks omitted). The prejudice from such error is also obvious: Nielsen's conviction of aggravated kidnapping stands separate from his conviction on aggravated murder, as does his separate sentence of fifteen years to life.

¶59 Because the independent conviction and sentence are plainly prejudicial to Nielsen, we reverse and vacate Nielsen's conviction and sentence on aggravated kidnapping, while leaving undisturbed his conviction and sentence on aggravated murder.[3] We

---

[3] Theoretically, an error in entering a separate conviction on a predicate offense could also have an impact on the sentence for the aggravated crime. But Nielsen has not alleged, much less established, a basis for that kind of prejudice, or requested a remand for resentencing on aggravated murder on such ground. Perhaps that is understandable, as our cases generally consider an error

also affirm Nielsen's two convictions for desecration of a human body.

——————

regarding a nonmerged predicate offense to be harmless as to the sentence on the greater offense, *see State v. Hill*, 674 P.2d 96, 98 (Utah 1983) (holding that theft conviction merged with aggravated robbery but declining to remand for resentencing on aggravated robbery), and the lack of a *conviction* on the predicate offense would not have foreclosed the sentencing jury from considering the *facts* establishing that offense. UTAH CODE § 76-3-207(2)(a) ("In capital sentencing proceedings, evidence may be presented on . . . the nature and circumstances of the crime . . . ."). In any event, we need not and do not reach these issues here, as they are not presented.