**2017 UT App 126**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.J.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

R.C.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160223-CA
Filed July 28, 2017

Fifth District Juvenile Court, Cedar City Department
The Honorable Thomas M. Higbee
No. 1099672

Matthew D. Carling, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and JILL M. POHLMAN concurred.

TOOMEY, Judge:

¶1      C.J. (Child) lived with S.J. (Mother) and was occasionally left in the care of R.C. (Father). When Child was eight months old, the juvenile court ordered her removal from Mother due to parental neglect. Father sought reunification with Child, but ultimately the juvenile court terminated his parental rights. He appeals that decision, challenging the sufficiency of the evidence to support termination and arguing that one of our rules of appellate procedure is unconstitutional. Because the evidence supporting termination is substantial, and because the Utah

Supreme Court has decided Father's constitutional argument in another case, we affirm.

BACKGROUND

¶2 Child was born premature and underweight and was in Mother's and maternal Grandmother's care for approximately the first five months of her life. Mother then left Grandmother's residence, and Child was thereafter cared for by Grandmother, who occasionally left her in the care of Father. Several months later, the Division of Child and Family Services (DCFS) successfully petitioned for her removal from Mother's custody for neglect. The juvenile court considered placing Child with Father, but it determined his situation was unsafe for Child because Father lived with his father (Grandfather), who abused substances "including oxycodone, oxymorphone, and methamphetamine" while he was also using methadone. By May 2014, Child was in DCFS custody.

¶3 When DCFS first became involved with Child, she was seven months old and weighed just ten pounds. She suffered constipation as well as "severe reflux" that triggered vomiting after she ate. She also was born with an ankle condition that required her to use braces. Before being placed with her foster parents, Child was diagnosed with "failure to thrive syndrome," which can be caused by parental neglect.

¶4 Eventually the juvenile court adjudicated Child neglected by Mother and ordered reunification services for both parents. In Father's case, the services included a child and family plan requiring him to: (1) undergo a psychological evaluation; (2) complete parenting classes; (3) find stable housing; (4) obtain stable employment; (5) remain drug and alcohol free; (6) develop a plan to live independently from Grandfather; (7) form healthy relationship boundaries with family; and (8) attend individual therapy.

¶5      In May 2015, the juvenile court conducted a permanency hearing and found that Child could not safely return to either parent, reunification was unlikely to occur within ninety days, neither parent had substantially complied with the respective child and family plan, and it was not in Child's best interests to return to either parent. In Father's case, the court focused on his failure to find housing separate from Grandfather, even though Father knew it was required by his plan, particularly because Grandfather's substance abuse issues remained unaddressed. The court was also concerned about Father's limited parenting skills, even after months of services to help him improve them. It changed Child's permanency goal from reunification to termination of each parent's rights.

¶6      Mother voluntarily relinquished her rights, but Father proceeded to trial. After trial and supplemental briefing, the juvenile court issued Findings of Fact and Conclusions of Law in support of its decision to terminate Father's parental rights. It determined that Child was "abused, neglected and dependent" based on Mother's conduct during Child's early infancy, and as to Father, that he was "dependent upon [Grandfather] to provide housing and other needs"; he "appear[ed] to have mental health issues"; at one time he lived with a girlfriend who was "low-functioning" and who "inappropriately cared for [Child] on more than one occasion"; he "live[d] in a home where there is significant substance abuse" although his own drug tests were "clean"; and while most of the fault lies with Mother, "the actions and inactions of the Father constitute[d] neglect of [Child]."[1]

---

1. The juvenile court detailed its determination that Father neglected Child:

> During this important formative time in the Child's
> life the Father essentially went about his life with
> little discernable effort to meet the needs and

(continued…)

¶7    The court catalogued the mixed success of reunification efforts. It noted that the plan to address Father's "parental deficiencies[2] consisted of parent training, remaining drug and alcohol free, psychological and parental fitness evaluations, individual therapy if recommended, and stable housing and employment independent of [Grandfather]." It individually addressed these subjects, finding that (1) Father "was still unsteady in his parenting skills, but did improve"; (2) the psychological evaluation "was ultimately determined to be invalid"; (3) Father was "way late getting into individual therapy," and once he began participating, "he did not do so to the point sufficient to identify and remedy [his] psychological, relationship and parenting flaws"; (4) Father "complied with the requirements of the service plan as it relates to his drug use"; (5) Father "improved his employment," which although it was inadequate to support himself and Child, was "certainly an improvement and is one sure sign of Father's commitment to his family obligations"; and (6) Father's regular visits with Child

---

(…continued)

> protect the safety of his child. He testified that Mother and [Grandmother] made his involvement difficult. And he did provide some care in the months immediately before removal. But overall, because of the actions and omissions of the parents, the Child's life was chaotic and her needs were not being adequately met. . . . [T]he Child still suffers the effects of this abuse and neglect.

2. The court explained, "The Father's parenting problems at the inception of the reunification case were: immaturity, lack of parental skill, lack of parental instincts, relationships, including both female relationships and relationship with [Grandfather], boundaries with family, mental health and independent stable housing and stable employment."

were "generally appropriate," and they have a "stable relationship."

¶8    The court extensively addressed the issues surrounding Grandfather:

> Father still lives with [Grandfather]. The court has mixed feelings about this. On the one hand, while parental independence is often significant, it is certainly not a litmus test for keeping parental rights. Father's reasons for staying with [Grandfather] are noble. [Grandfather] has health and medication management issues and Father wants to help.
>
> On the other hand, living with [Grandfather] creates significant issues. [Grandfather] is not safe as a care giver and family support provider for the Child. The Child could not safely be placed with him at the beginning of the case. Grandfather has a drug problem. He tested positive for methamphetamine which he tried unsuccessfully to explain away. He has a prescription medication problem. He never took accountability or obtained treatment. He's never meaningfully addressed his addiction issues, which appear to be significant involving both pain medications and methamphetamine. Grandfather also has lifestyle issues. Near the end of the reunification period, Father, of his own choice, became the primary care giver for [G]randfather. This goes the opposite direction from that outlined in the service plan. Instead of achieving independence Father has cemented the enmeshment. So this Child would be raised in that environment. Significantly, Father will rely extensively on [G]randfather to tend the Child when Father is at work and to transport both

Father and the Child. This Father has no driver[] license, no car, and relies on [Grandfather] or others in getting place to place. Of necessity, then, the same reliance would have to be placed on others for the transportation of the Child. It would be rare indeed for this court to leave a child in a generationally unstable home with unaddressed methamphetamine and pain management issues.

It added that even though well-intentioned, "[F]ather simply does not have the current skill, ability or aptitude to provide the level of care required by [Child]."

¶9    With respect to Child, the juvenile court noted her improvement since she was placed in foster care, but also noted that "[s]he still has extraordinary needs." "There are still developmental issues, feeding and reflux issues, and the ankle issues that will just have to be addressed over time. . . . And if the first two years of this Child's life are any indication, there will be other issues [that] arise as the Child grows." Meeting those needs will require "exceptional parenting skills," and "[o]ngoing care, encouragement, teaching and correction will have to be consistent and reliable."

¶10    The court's assessment of the foster family was favorable. They were "exceptional"; "skilled, attentive, consistent and committed"; and "have demonstrated their ability to properly raise this Child in every way." Child's needs were "best met by the foster parents," and although Father had "made a respectable effort to adjust his circumstances, conduct and conditions, [he] ha[d] not done so to a degree sufficient to make it in the Child's best interest" to return to him. Moreover, Child had "become integrated into the foster family to the extent that her familial identity is indeed with that family." Although Child had emotional ties with Father, as well as her foster family, "[t]he foster family ha[d] significantly greater capacity and

disposition to give the [C]hild love, affection and guidance and to continue the education of the Child than does [Father]."

¶11  The court ultimately found that Father was unfit, "failed at parental adjustment," and had "substantially neglected, willfully refused, or been unable or unwilling to remedy the circumstances which cause[d] the Child to be in an out of home placement. There [was] a substantial likelihood that the Father [would] not be capable of exercising proper and effective parental care in the near future." It found that "[t]ermination of parental rights is strictly necessary."

¶12  The juvenile court was troubled by the termination decision[3] and had previously requested supplemental briefing from the attorneys in addition to engaging in its own research on the matter of its discretion in termination cases. Ultimately, though, it proceeded with termination and concluded the State had proven Father's neglect, unfitness, lack of parenting skills, and failure of parental adjustment. It also found that termination would be in Child's best interests. It concluded, "In reality, . . . there is no way the court could return [Child] to [Father] because of the risks in the existing home. With that option eliminated, and the court arguably precluded by statute from granting additional reunification services, termination of parental rights became the only realistic viable option."

ISSUES AND STANDARD OF REVIEW

¶13  Father contends the evidence was insufficient to support the juvenile court's decision to terminate his parental rights. "When a challenge to the sufficiency of the evidence is raised,

---

3. The juvenile court noted, "This case gives the court considerable pause," because it "hesitates to take such dramatic action for a relatively common form of neglect," and "Father showed considerable effort during the service plan."

[w]e review the juvenile court's factual findings based upon the clearly erroneous standard." *In re J.C.*, 2016 UT App 10, ¶ 13, 366 P.3d 867 (alteration in original) (citation and internal quotation marks omitted). To overturn the juvenile court's decision, "[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (alteration in original) (citation and internal quotation marks omitted). "When a foundation for the juvenile court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶14 Father also contends that Utah Rule of Appellate Procedure 58 unconstitutionally deprives parents of their meaningful right to appeal. Our supreme court has examined and rejected this very contention in *In re B.A.P.*, 2006 UT 68, 148 P.3d 934. Therefore, we follow *In re B.A.P.* and reject Father's contention here.[4]

---

4. Additionally, Father's contention is moot on appeal. Rule 58(a) of the Utah Rules of Appellate Procedure allows this court to decide a case after reviewing the petition on appeal, or alternatively allows this court to set the case for full briefing. In child welfare proceedings, the petition on appeal may not exceed fifteen pages. Utah R. App. P. 55(c). Father argues rule 58 is unconstitutional because it allows this court to deny full briefing to a party. Father further argues the fifteen page limit of the petition makes it impossible for a party arguing insufficiency of the evidence to meet the marshalling requirement, for "a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues." *State v. Nielsen*, 2014 UT 10, ¶ 40, 326 P.3d 645; *see* Utah R. App. P. 24(a). Father concedes that this issue is moot in his case because he was granted full briefing on appeal. He argues we should nevertheless address this issue under the public interest

(continued…)

ANALYSIS

¶15    Father contends there is insufficient evidence to terminate his parental rights. A juvenile court must make "two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118. First, "the court must find that the parent is below a minimum threshold of fitness," *see id.*; Utah Code Ann. § 78A-6-507 (LexisNexis 2012) (citation and internal quotation marks omitted), and "the finding of any single ground [of parental unfitness under the statute] is sufficient to warrant termination of parental rights," *see In re R.D.*, 2013 UT App 127, ¶ 4, 302 P.3d 497 (per curiam). Second, the court must find that the child's best interests are served by terminating parental rights. *See In re R.A.J.*, 1999 UT App 329,

---

(…continued)

exception because it evades review—whenever this court grants full briefing, the issue becomes moot. *See Ellis v. Swensen*, 2000 UT 101, ¶¶ 25–26, 16 P.3d 1233 (stating an appellate court will consider a moot issue if it falls under the public interest exception by affecting the public interest, being likely to recur, and being capable of evading review). We decline to address this issue under the public interest exception first because it is capable of being reviewed by the Utah Supreme Court through a petition for a writ of certiorari, and second because the Utah Supreme Court has already decided rule 58 is constitutional. *See In re B.A.P.*, 2006 UT 68, ¶¶ 13, 20, 148 P.3d 934. *In re B.A.P.* was decided under the more stringent marshalling requirements that preceded *Nielsen*, but the supreme court still concluded rule 58 was constitutional. *See id.* ("If an appellant finds fifteen pages to be inadequate, then wisdom dictates use of some of those pages to persuade the court of appeals that full briefing is needed. Otherwise, the page limit is just a matter of convenience and uniformity; it has nothing to do with limiting the scope of the appeal.").

¶ 7; Utah Code Ann. § 78A-6-506(3). Father argues the evidence was insufficient for the court to make these findings.

I. Sufficient Evidence Demonstrates Father Is an Unfit Parent.

¶16    In terminating Father's parental rights, the juvenile court concluded four different grounds justified the termination: Father (1) neglected Child, in that "Father's actions demonstrated a 'lack of proper parental care of a child by reason of the faults or habits of the parent,'" (2) was unfit, (3) failed at parental adjustment, and (4) failed to remedy the circumstances which led to removal. *See* Utah Code Ann. § 78A-6-507(1)(b)–(e); *see also id.* § 78A-6-105(27)(a)(ii) (LexisNexis Supp. 2016) (defining neglect). One ground alone is sufficient for a juvenile court to terminate parental rights, *see id.* § 78A-6-507(1), and because we determine there was sufficient evidence that Father was an unfit parent, we decline to analyze whether there was sufficient evidence supporting the other grounds for termination.

¶17    Father argues there is insufficient evidence demonstrating he is an unfit parent. He asserts he has taken parenting classes, enrolled in individual therapy, and found stable employment. Father acknowledges he was required to secure stable housing but argues his residence with Grandfather is "safe and stable," and there was no evidence presented that Grandfather was unfit to help care for Child. Father also acknowledges his psychological evaluation was invalid, which delayed his enrollment in therapy, but he alleges the delay "was no fault" of his own.

¶18    The Utah Code lists several conditions a juvenile court "shall consider" when determining "whether a parent or parents are unfit," though the court is not limited to considering the listed conditions. Utah Code Ann. § 78A-6-508(2) (LexisNexis Supp. 2016). Among these conditions are (1) "emotional illness, mental illness, or mental deficiency of the parent that renders the parent unable to care for the immediate and continuing physical

or emotional needs of the child for extended periods of time" and (2) "repeated or continuous failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for the child's physical, mental, and emotional health and development by a parent or parents who are capable of providing that care." *Id.* § 78A-6-508(2)(a), (d).

¶19   The juvenile court carefully considered the evidence and gave "three primary reasons" for its decision that Father was unfit: (1) "Father is unable to provide a proper home for the Child," (2) "Father failed to address his mental health issues," and (3) "Father's parenting skills are simply not sufficient to meet the high needs of this Child." The juvenile court's decision was based on substantial evidence.

¶20   First, the court determined that Father was unable to provide a proper home for Child. Father's child and family plan required him to find stable housing and develop a plan to live independently from Grandfather. But despite this requirement, the court determined Father "still lives with [Grandfather]" and this "creates significant issues." Grandfather's substance abuse issues were the main reason for Child's removal from Father's care. Father's willingness to care for Grandfather is honorable, but his choice to continue to live with Grandfather prevents Father from providing a safe environment for Child. Father argues that he bought a lockbox for Grandfather's medication and that his residence with Grandfather is "safe and stable." But Grandfather's "significant substance abuse" involves methamphetamine and other drugs, and he never "took accountability or obtained treatment." These issues are unresolved, and Father indicated Grandfather would assist with Child's care. We agree with the juvenile court that placing Child in Father's care was not a viable option while Father continued to reside with Grandfather. *See id.* § 78A-6-508(2)(d).

¶21   Next, the court determined Father "failed to address his mental health issues," primarily because his psychological evaluation was invalid, which caused delays in identifying and

addressing Father's mental health needs. In addition to this, "because of Father's procrastination, he was way late in getting into individual therapy." Father argues that this was not his fault, but regardless of the problems with the evaluation, there was nothing that prevented him from enrolling in individual therapy. Ultimately, he did enroll and participate in some sessions, but it was insufficient to "identify and remedy" his "psychological, relationship, and parenting flaws," and Father's mental health issues rendered him "unable to care for the immediate and continuing physical or emotional needs of" Child. *See id.* § 78A-6-508(2)(a).

¶22   Finally, the court determined "Father's parenting skills are simply not sufficient to meet the high needs of this Child."[5] The court noted the progress Father had made with his parenting skills—Father enrolled in classes, "[h]e listened and tried to do the things he was taught," and his skills improved. But the court recognized Child had "extraordinary needs" including "severe reflux issues, ear infections, motor skill and developmental issues, feeding issues, and issues with her ankles." While the court was sympathetic with Father, and noted he had made significant efforts to improve his parenting ability, Father was still unable to care for Child and her substantial needs. Father had to be retaught basic skills during each visit with Child, and even then, continued to be uncomfortable changing Child's diaper. Father does not have the ability to provide the "care necessary for [Child's] physical, mental, and emotional health and development." *See id.* § 78A-6-508(2)(d). We agree with the juvenile court that Father's lack of parenting skills "may not be enough by itself" to terminate parental rights,

---

5. The standard of parental fitness may vary depending on the needs of the child. *See In re Anjoski*, 770 N.W.2d 1, 14 (Mich. Ct. App. 2009) (stating that when determining parental fitness, "the inquiry must focus on a parent's abilities relative to the child's needs").

but together "with the lack of a proper home and failure to address the mental health concerns[,] this constitutes unfitness."

¶23 Father has made consistent efforts to improve, but substantial evidence demonstrates the lack of a proper home for Child, Father's failure to adequately address his mental health issues, and his inability to care for Child's special needs. We conclude the juvenile court had sufficient evidence to determine Father was an unfit parent.

## II. Sufficient Evidence Demonstrates Termination Is in Child's Best Interests.

¶24 Next, Father contends the court determined without sufficient evidence "that it was not in the best interests of the Child to be returned to Father." Father has not adequately briefed this contention; the issue is mentioned once in the briefing and never elaborated on or otherwise analyzed. *See* Utah R. App. P. 24(a)(9) (requiring an appellant's brief to "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes and parts of the record relied on"); *State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

¶25 In any event, there was sufficient evidence to support the finding that termination was in Child's best interests. Though Father had a strong bond with her and attempted to improve his situation and skills, at the time of the termination trial, Father's parenting skills were not sufficient to meet Child's basic and significant needs. Father still lived with Grandfather, whose substance abuse was the primary reason Child could not be placed in Father's care. In contrast, Child's foster parents demonstrated their ability to care for her substantial needs, and have been giving her feeding therapy to help with her reflux issues, physical therapy for her ankle problems, and therapy to develop her motor skills. Child has improved dramatically

under their care, and they have the skills necessary to continue to meet her needs. In addition, the foster parents testified they love Child and wish to adopt her. This evidence sufficiently supports the juvenile court's finding that termination was in Child's best interests. *See In re F.B.*, 2012 UT App 36, ¶¶ 5–7, 271 P.3d 824 (per curiam) (considering several factors when determining that termination was in the children's best interests, including time resided with the foster parents, integration into the foster family, the foster parents' ability to respond to the children's needs, the children's need for permanency, and the mother's history of problematic behavior).

CONCLUSION

¶26   We conclude there was sufficient evidence for the juvenile court to terminate Father's parental rights and accordingly affirm the judgment of the juvenile court.

_____