**2015 UT App 300**

# THE UTAH COURT OF APPEALS

AMERICANWEST BANK,
Appellee,
*v.*
SANDY G. KELLIN,
Appellant.

Opinion
No. 20140651-CA
Filed December 17, 2015

Third District Court, Silver Summit Department
The Honorable Todd M. Shaughnessy
No. 100501018

S. Brook Millard and Gregory D. Marchant,
Attorneys for Appellant

Jonathan A. Dibble, Steven W. Call, and A.J. Green,
Attorneys for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN concurred.[1]

PEARCE, Judge:

¶1     Sandy G. Kellin appeals from the district court's entry of a
deficiency judgment in favor of AmericanWest Bank (AmWest),
formerly known as Far West Bank. We affirm and remand for
calculation of AmWest's attorney fees incurred on appeal.

---

1. Judge James Z. Davis participated in this case as a member of
the Utah Court of Appeals. He retired from the court on
November 16, 2015, before this decision issued.

BACKGROUND

¶2     In October 2007, Kellin individually borrowed $1,120,000 from AmWest to purchase a condominium unit, Unit 302, at the Red Stag Lodge at the Deer Valley Resort. A deed of trust recorded against Unit 302 secured the loan. In November 2007, Kellin and an associate, Brent Bryson, borrowed $958,000 from AmWest to purchase another Red Stag Lodge condominium unit, Unit 402. A trust deed on Unit 402 secured this loan.

¶3     Kellin and Bryson planned to fractionalize their ownership of the units into one-eighth shares and sell those fractionalized shares at a profit. But as Robert Burns observed, "The best-laid schemes o' mice an' men gang aft agley an lea's us nought but grief an' pain for promis'd joy." Robert Burns, *Tae a Moose*, *in* The Best Laid Schemes: Selected Poetry & Prose of Robert Burns 48 (Robert Crawford & Christopher MacLachlan eds., 2009). Kellin sold one share in Unit 302, resulting in a partial reconveyance of the Unit 302 trust deed and a reduction in the loan amount by $242,563. Kellin and Bryson sold no other shares, and both loans went into default.

¶4     AmWest foreclosed its interests in both units. A trustee's sale of Unit 402 took place in September 2010, at which AmWest purchased the property with a credit bid of $625,000. At the time of the trustee's sale, the amount owing on the Unit 402 loan—including interest, costs, and fees—was $1,044,453. A trustee's sale of Kellin's remaining seven-eighths interest in Unit 302 occurred in January 2011. AmWest purchased that interest with a credit bid of $455,000. The total amount owing on the Unit 302 loan at the time of the trustee's sale was $995,777.

¶5     AmWest sought a deficiency judgment against Kellin and Bryson to recover the remaining amount owing on the Unit 402 loan after the trustee's sale, and against Kellin to recover the amount remaining due on the Unit 302 loan after the trustee's sale. Bryson settled with AmWest. AmWest obtained summary

judgment against Kellin and thereby established the amount owing on each of the loans and other uncontested issues. The matter then proceeded to trial to calculate the fair market value of each foreclosed interest at the time of its sale.

¶6      At trial, each side presented expert testimony from a qualified appraiser.[2] Both experts testified that the highest and best use of the units was as residential condominiums, and both experts based their valuations on a comparable-sales analysis. AmWest's expert, Kevin Weed, opined that Unit 302 was worth $615,000 as a whole, but he adjusted the valuation to $538,125—a deduction of one-eighth—to account for the one-eighth interest that had been sold. Weed further opined that Unit 402 was worth $580,000. Weed also testified that there was "no market for eighth share units."

¶7      Kellin's expert, Robert Hunt, took a different approach. Hunt appraised the value of an individual one-eighth share in each unit. Hunt testified that a one-eighth share of Unit 302 was worth $150,000 and that a similar share of Unit 402 was worth $157,000.[3] Hunt testified that each one-eighth share of each unit

---

2. Kellin and Bryson also testified about the units' values, but the district court found that their personal opinions were "not particularly helpful" in light of their "obvious stake in the outcome."

3. The comparable sales that Hunt used to evaluate the one-eighth shares in Units 302 and 402 were actually one-quarter interests in units at a different lodge in Park City. Hunt declined to adjust the one-quarter-share values in half for comparison purposes, explaining that such a division would violate governing appraisal standards. Nevertheless, Hunt testified that, for a variety of reasons, he believed those quarter-interest sales

(continued…)

had the same value because the shares were "fungible," i.e., "[t]hey're all the same eighth share." Kellin then used Hunt's testimony to argue to the district court that the foreclosed interest in Unit 302 was worth $1,050,000 ($150,000 multiplied by seven) and that Unit 402 was worth $1,256,000 ($157,000 multiplied by eight).[4]

¶8    The district court rejected Kellin's attempt to value the foreclosed interests by multiplying the value of the one-eighth shares. The court concluded that Kellin's approach violated the governing Uniform Standards of Professional Appraisal Practice (USPAP), one of which commands appraisers to "refrain from valuing the whole [of a property] solely by adding together the individual values of [its] various estates or component parts." *See* Appraisal Standards Board: The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standards Rule 1-4(e) (2014–2015 ed.), http://www.uspap.org/#2. The district court accepted Weed's testimony that the fair market value of Unit 402 was $580,000, noting that Weed's appraisal "obviously is dramatically less than the unit was worth prior to the real estate collapse." However, the district court stated that some of its concerns were ameliorated because AmWest's credit bid exceeded the valuation of the unit's fair market value. The district court then calculated the deficiency judgment as to Unit

---

(…continued)

were comparable to the eighth-share interests in Units 302 and 402 for valuation purposes.

4. Both the parties and the district court, at times, switched Hunt's $150,000 and $157,000 valuations; sometimes giving Unit 302 the $150,000 valuation and sometimes ascribing it to Unit 402. That imprecision does not substantively impact our analysis on appeal, and we correct the values used in this opinion to reflect Hunt's actual testimony.

402 by subtracting the $625,000 credit bid from the $1,044,453 owing on the loan and dividing the resulting deficiency amount in two to account for the settlement between AmWest and Bryson. Thus, the district court calculated the deficiency judgment against Kellin on Unit 402 as $209,727, plus associated interest, costs, and attorney fees.

¶9     As to Unit 302, the district court stated that the fractional nature of the foreclosed seven-eighths interest was "more problematic" and that "neither party's expert addressed the issue adequately." The district court did not accept Kellin's argument that a one-eighth share, which Hunt appraised at $150,000, could be multiplied by seven to arrive at a whole value of the seven-eighths interest, but the court also rejected Weed's testimony that the value of the unit as a whole could simply be reduced by one-eighth. Both methods, the district court explained, violated USPAP rule 1-4(e). The district court found that AmWest had presented credible evidence of the fee simple value of Unit 302 but had failed to present credible evidence of the value of the seven-eighths interest in Unit 302 that was actually foreclosed. The district court then explained,

> If [AmWest] wanted an offset in any amount less than the fair market value of the entire unit, it was obligated to come forward with admissible evidence of that amount. [AmWest] failed to do so. Because [AmWest] failed to meet its burden of proof to show how much less a 7/8 interest is worth, Kellin is entitled to a credit in the only amount [AmWest] did offer—the value of a fee simple interest, $615,000.

The district court then subtracted the fee simple value of Unit 302—$615,000—from the $995,777 owing on the Unit 302 loan to obtain a deficiency judgment amount of $380,777, plus interest, costs, and attorney fees.

¶10   The district court entered a final deficiency judgment against Kellin that combined the two individual deficiency judgments and added interest, costs, and attorney fees. Kellin appeals.

ISSUES AND STANDARDS OF REVIEW

¶11   Kellin raises various challenges to the district court's determination of the fair market value of the foreclosed interests in Unit 302 and Unit 402. To the extent Kellin's arguments challenge the district court's legal rulings, we review those rulings for correctness. *See St. Jeor v. Kerr Corp.*, 2015 UT 49, ¶ 6, 353 P.3d 137; *see also In re Anna Blackham Aagard Tr.*, 2014 UT App 269, ¶ 11, 339 P.3d 937. To the extent Kellin's arguments challenge the district court's factual findings, we review for clear error. *In re Anna Blackham Aagard Tr.*, 2014 UT App 269, ¶ 11.

ANALYSIS

I. Utah's Deficiency Judgment Statute

¶12   Utah Code section 57-1-32 governs Utah's statutory process for obtaining a deficiency judgment against a debtor. *See Machock v. Fink*, 2006 UT 30, ¶ 10, 137 P.3d 779 ("Once a creditor elects to foreclose a trust deed, . . . section 57-1-32 provides the only procedure for obtaining recovery of the remaining balance due."). Section 57-1-32 states, in its entirety,

> At any time within three months after any sale of property under a trust deed as provided in Sections 57-1-23, 57-1-24, and 57-1-27, an action may be commenced to recover the balance due upon the obligation for which the trust deed was given as security, and in that action the complaint shall set forth the entire amount of the

> indebtedness that was secured by the trust deed, the amount for which the property was sold, and the fair market value of the property at the date of sale. Before rendering judgment, the court shall find the fair market value of the property at the date of sale. The court may not render judgment for more than the amount by which the amount of the indebtedness with interest, costs, and expenses of sale, including trustee's and attorney's fees, exceeds the fair market value of the property as of the date of the sale. In any action brought under this section, the prevailing party shall be entitled to collect its costs and reasonable attorney fees incurred.

Utah Code Ann. § 57-1-32 (LexisNexis 2010). In other words, when the proceeds from a trustee's sale do not completely satisfy the debt underlying a trust deed, section 57-1-32 allows the creditor to sue the debtor in an attempt to recover the amount remaining due on the note. *Id.*

¶13 However, section 57-1-32 provides an important protection for debtors by capping the amount of the deficiency judgment at the difference between the amount owing on the note (with interest, costs, and expenses of sale) and the fair market value of the foreclosed property at the time of the trustee's sale. *Id.* This provision "is meant to prevent creditors from reaping a windfall by obtaining valuable trust deed property at a fraction of its fair market value while pursuing the debtor (or guarantor) for the full amount due on the underlying note." *Machock v. Fink*, 2004 UT App 376, ¶ 14, 101 P.3d 404, *aff'd*, 2006 UT 30, 137 P.3d 779; *see also City Consumer Servs., Inc. v. Peters*, 815 P.2d 234, 238 (Utah 1991).

¶14 Thus, in the ordinary deficiency action, it is in the creditor's interest to establish a low fair market value of the foreclosed property to avoid or minimize the effect of the

statutory cap and obtain a judgment for as close as possible to the full amount of the deficiency. By contrast, the debtor has an incentive to show that the foreclosed property had a high fair market value, so as to minimize or even eliminate the creditor's deficiency judgment.

¶15  The parties' positions in this case illustrate those competing incentives in practice. AmWest presented expert testimony from Weed that valued Unit 402 substantially below the amount of AmWest's credit bid on that unit. When the district court accepted Weed's valuation of Unit 402, the fair-market-value cap was not triggered and AmWest received a judgment for the full amount of the deficiency as to that unit. Kellin, on the other hand, used Hunt's testimony to argue that the fair market value of each foreclosed interest exceeded the total amounts owing on the respective notes. Had the district court accepted Kellin's argument, the statutory cap would have precluded a deficiency judgment as to either unit.

## II. Burden of Proof

¶16  Kellin contends that AmWest bears the burden of proving all aspects of its claim for a deficiency judgment. Kellin argues that AmWest's burden of proof includes not just the responsibility to establish the amount of the deficiencies—i.e., the difference between the trustee's sales amounts and the total debt owing on each loan—but also the responsibility to prove the fair market value of the foreclosed interests for purposes of establishing the statutory cap. *See* Utah Code Ann. § 57-1-32. Under Kellin's conceptualization of the burden of proof, a creditor who can establish the amount of a deficiency but fails to put forth credible evidence of the fair market value of the foreclosed property is simply precluded from obtaining a deficiency judgment.

¶17  AmWest responds that it complied with Utah Code section 57-1-32 by "setting forth . . . the fair market value" in its

pleading, after which it was "the District Court's duty to determine the fair market value of the trust properties foreclosed based upon the evidence received." However, elsewhere in its brief, AmWest argues that it "met its burden as to the fair market value of [the foreclosed interests]," a position that AmWest also took in the district court.

¶18    We decline to resolve the question of which party to a deficiency action, if either, has the burden of proving the fair market value of a foreclosed property, because such a determination is not necessary for the resolution of this appeal. The district court concluded that AmWest had the burden of establishing the fair market value of the foreclosed interests, and the court calculated the deficiency judgment after applying that burden of proof. Because the district court applied Kellin's proposed burden of proof, we assume for purposes of this appeal that the district court allocated the burden correctly and evaluate Kellin's remaining arguments accordingly.

### III. Highest and Best Use

¶19    Kellin's appeal centers on his argument that the highest and best use of the Unit 302 and Unit 402 interests required them to be valued as a collection of fractional one-eighth shares. Kellin argues that evaluating the interests' fair market values as a conglomeration of one-eighth shares would have yielded the highest value and that the district court erred in accepting Weed's testimony that the highest value of each unit was as a single whole. Kellin also argues that the district court erred in concluding that valuation of the interests as undivided parcels was required because Kellin's interests in the properties were foreclosed and sold as undivided parcels.

¶20    In light of the evidence before the district court, we see no error in the court's decision to value the interests as whole parcels rather than as collections of fractional shares. The district

court considered Kellin's proposed valuation method and explained that it could

> envision a valuation arrived at by determining the value of a 1/8 interest, the amount of time a reasonably prudent investor would have to hold the property to sell such interests, the carrying and sales costs such an investor would incur, a reasonable profit, etc., all discounted to a net present value as of the date of the foreclosure.

However, the district court further explained why it did not adopt that approach: "Hunt did not undertake that analysis (and it is not clear he has the qualifications necessary to do so) and Kellin did not offer testimony from any other expert who could offer such an opinion."

¶21 Thus, the district court did not limit its valuation of the unit interests based on the legal configuration in which they were foreclosed and sold. Nor did it refuse to consider the possibility that the highest and best use of the interests was as fractional shares. Rather, the court acknowledged the possible relevance of the value of the one-eighth shares to the value of the foreclosed interests as a whole. But the court rejected Kellin's attempt to calculate the values of those interests based solely on a multiplication of the value of the fractional shares because the court concluded that Kellin did not provide the court with credible evidence about the *combined* value of the fractional shares. The court concluded that simple multiplication, without adjustment to account for factors such as those the court identified, was not a reliable indicator of the foreclosed interests' fair market value and could not serve to rebut Weed's testimony.

¶22 The district court's approach was consistent with, if not mandated by, the USPAP standards, which the Utah Legislature has adopted as the accepted professional standards for

appraisals. *See* Utah Code Ann. § 61-2g-403(1) (LexisNexis Supp. 2015). USPAP rule 1-4(e) states,

> When analyzing the assemblage of the various estates or component parts of a property, an appraiser must analyze the effect on value, if any, of the assemblage. An appraiser *must refrain* from valuing the whole solely by adding together the individual values of the various estates or component parts.

Appraisal Standards Board: The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standards Rule 1-4(e) (2014–2015 ed.), http://www.uspap.org/#2 (emphasis added). The comment to USPAP rule 1-4(e) further explains,

> Although the value of the whole may be equal to the sum of the separate estates or parts, it also may be greater than or less than the sum of such estates or parts. Therefore, the value of the whole must be tested by reference to appropriate data and supported by an appropriate analysis of such data.

*Id.* In essence, the district court rejected Hunt's testimony as a basis for establishing the fair market value of the respective interests because Kellin's proposed use of Hunt's testimony was not "tested by reference to appropriate data [or] supported by an appropriate analysis of such data." *See id.*

¶23 We note that the evidence presented to the district court bolsters its conclusion. There was ample evidence before the court that there was little, if any, market for one-eighth shares in the units at the time of the trustee's sales. Hunt could find no comparable sales of one-eighth condominium shares and relied instead on sales of one-quarter interests to reach his valuations. Weed testified that "there is no market for eighth share units" because "there was no evidence of any sales." And prior to the

foreclosures, Kellin had been able to sell only one of the sixteen fractional shares in the units that he and Bryson had placed on the market.[5]

¶24 The district court's valuation analysis in this case complied with USPAP rule 1-4(e) and was consistent with the evidence that there was no viable market for one-eighth shares of the units at the time of the trustee's sales. In light of this, we cannot conclude that the district court erred in refusing to apply Kellin's proposed valuation methodology.

## IV. The District Court's Credibility Determination

¶25 Kellin argues that the district court recognized that Weed's testimony was not credible and erred by nevertheless basing its valuation on that testimony. Determinations regarding the weight to be given to the testimony of expert witnesses "are within the province of the finder of fact, [and] we will not second guess a court's decisions about evidentiary weight and

---

5. Despite this evidence, Kellin argues that Weed should have valued the foreclosed interests as fractional shares, as that constituted the highest and best use of the property. Kellin further argues that the district court erred in relying upon Weed's testimony which, Kellin claims, "never even calculated or looked at the value of the fractions in" the foreclosed properties. Weed testified, "My decision on highest and best use *because of an absence of demand* was to not look—not view the subject based on fractionalization." (Emphasis added.) In other words, Weed testified as to why he valued the interests in the manner he did and testified as to what he considered the problems with the valuation method Kellin proposed. As discussed herein, the district court has wide latitude to determine expert witness credibility, and the district court did not clearly err in deciding to credit Weed's expert opinion over Hunt's. *See infra* ¶ 26.

credibility if there is a reasonable basis in the record to support them." *Fullmer v. Fullmer*, 2015 UT App 60, ¶ 25, 347 P.3d 14 (alteration in original) (citation and internal quotation marks omitted). "Thus, we may reverse a trial court's credibility determination if its findings in support of that determination are 'clearly erroneous,' that is, if they 'are against the clear weight of the evidence,'" or if we otherwise reach "'a definite and firm conviction that a mistake has been made.'" *Woodward v. LaFranca*, 2013 UT App 147, ¶ 7, 305 P.3d 181 (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)).

¶26　As noted above, Kellin argues that the district court deemed Weed's testimony to lack credibility but nevertheless accepted it as the basis for its fair market value determination. To make this argument, Kellin mines the district court's order and points to observations the district court made in its findings of fact and conclusions of law. The district court stated that Weed's valuation of Unit 402 at $580,000 "obviously is dramatically less than the unit was worth prior to the real estate collapse." The district court also observed that Weed's valuation of Unit 402 was "not entirely satisfactory to the court" and "left several questions unanswered." The district court described the valuation of Unit 302 as "more problematic" and stated that "neither party's expert addressed the issue adequately." As to Weed's deduction of one-eighth of his appraised whole-unit value of Unit 302 to account for the seven-eighths interest in that unit, the district court stated that this portion of Weed's testimony was "entirely lacking in the foundation," "contradicts the very USPAP principles he insists must be applied," and "is simply not credible."

¶27　Pointing to the district court's critiques of Weed's testimony, Kellin argues that the district court was required to disregard Weed's testimony altogether. Kellin's argument ignores other statements in the district court's order that more completely reflect the court's evaluation of Weed's credibility.

As to Unit 402, the district court noted that Weed "offered his explanations" for the unit's steep decline in value after "the real estate collapse." Despite the noted shortcomings in Weed's testimony, the district court ultimately described it as "the best indication of the fair market value of Unit 402" and "the most reliable information that was presented to the court at trial." And the district court's statement that Weed's valuation of Unit 302 was not credible was directed solely at the portion of Weed's testimony that deducted one-eighth off the whole-unit valuation, which the district court did not use to calculate the deficiency judgment.

¶28    Reading the district court's findings of fact and conclusions of law as a whole, we do not agree with Kellin's contention that the district court found Weed's testimony to be incredible. We also reject Kellin's argument that the district court, by recognizing issues with parts of Weed's testimony, was constrained from relying upon other portions of the testimony it found to be credible. We further note that Weed's qualifications as an appraiser were unchallenged before the district court and that he reached his whole-unit valuation of Unit 302 using the generally accepted approach of evaluating the sales of comparable properties. On the record before us, we cannot conclude that the district court's acceptance of Weed's testimony appraising the interests, while simultaneously recognizing deficiencies in that testimony, was clearly erroneous. To the extent AmWest bore the burden of demonstrating the fair market value of the foreclosed interests, the district court did not clearly err in relying upon the aspects of Weed's testimony that the court found credible to ultimately find that AmWest had met its burden.

## V. Valuation of Unit 302

¶29    Kellin argues that the district court erred when it entered a deficiency judgment with respect to Unit 302 because AmWest failed to provide credible evidence of the fair market value of the

seven-eighths interest in that unit at the time of its foreclosure. The district court based its valuation on Weed's opinion of Unit 302's fee simple value. Kellin has not demonstrated that the district court's reliance on Weed's testimony was in error.

¶30 The district court noted that valuing Unit 302 was "more problematic" than valuing Unit 402, presumably referring to the expert witnesses' difficulties in appraising Kellin's seven-eighths interest in Unit 302. Hunt testified only as to the value of a one-eighth interest in Unit 302, and Kellin advocated multiplying that value by seven to reach the aggregated seven-eighths value. The district court rejected this approach as violative of USPAP standards. *See* Appraisal Standards Board: The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standards Rule 1-4(e) (2014–2015 ed.), http://www.uspap.org/#2.

¶31 Weed appraised the whole value of Unit 302 based on comparable sales and then multiplied that value by seven-eighths to account for Kellin's partial interest. The district court accepted Weed's whole-unit valuation of Unit 302 but rejected the seven-eighths adjustment for the same reason it had rejected Hunt's testimony. *See id.* ("A similar procedure must be followed when the value of the whole has been established and the appraiser seeks to value a part. The value of any such part must be tested by reference to appropriate data and supported by an appropriate analysis of such data.").

¶32 After rejecting Hunt's and Weed's mathematical adjustments, the district court still had two expert opinions before it: Hunt's testimony that a one-eighth interest in Unit 302 was worth $150,000 and Weed's testimony that the undivided whole-unit value of Unit 302 was $615,000. The district court concluded that based on the evidence before it, it could not scale either of these figures to obtain an exact value of the seven-eighths interest without either speculating or applying the same type of mathematical adjustment that the court had already

determined was improper. The district court ultimately determined the fair market value by deeming the value of the seven-eighths interest to be equal to the value of the whole-unit interest. The district court explained,

> [AmWest] has the burden of proof. If the bank wanted an offset in any amount less than the fair market value of the entire unit, it was obligated to come forward with admissible evidence of that amount. [AmWest] failed to do so. Because [AmWest] failed to meet its burden of proof to show how much less a 7/8 interest is worth, Kellin is entitled to a credit in the only amount the bank did offer—the value of a fee simple interest, $615,000.

The district court noted that no evidence had been presented that the seven-eighths interest in Unit 302 could be worth more than the value of the unit as a whole and, thus, that "Weed's calculation of the fair market value of the entire fee estate represents the absolute outer limit of the fair market value of the 7/8 interest that was actually conveyed." The district court then based the valuation on that "absolute outer limit."

¶33    Kellin has not established any error—and certainly not any error that caused him any harm—in the district court's approach. Weed's testimony provided competent evidence as to the whole-unit value of Unit 302. The district court's use of the whole-unit value of Unit 302, rather than the lesser value of the seven-eighths interest that was actually foreclosed, resulted in a higher fair market value and a lower deficiency judgment against Kellin under Utah Code section 57-1-32. AmWest could have obtained a higher deficiency judgment by presenting competent evidence of the value of the partial interest in Unit 302. It did not do so, but its failure did not deprive the district court of the ability to enter a deficiency judgment based on credible evidence of Unit 302's whole-unit value. Further, any

error in the district court's approach benefitted Kellin.[6] *Cf. Ross v. Epic Eng'g, PC*, 2013 UT App 136, ¶ 12, 307 P.3d 576 ("'The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.'" (quoting Utah R. Civ. P. 61)).

## VI. Valuation of Unit 402

¶34 Finally, Kellin argues that the district court erred by using AmWest's credit bid on Unit 402 as evidence of that unit's fair market value. We reject this argument because it does not accurately reflect the district court's actions.

¶35 The district court found, based on Weed's testimony, that the fair market value of Unit 402 was $580,000. As discussed above, the district court noted several shortcomings in Weed's testimony. The district court then stated, "Some of the court's concerns about Mr. Weed's appraisal are ameliorated by the fact that the [$625,000] credit bid [AmWest] made at the trustee's sale exceeded Mr. Weed's calculation of the fair market value, and Kellin is entitled to the benefit of the greater amount."

¶36 Thus, the district court did not use the $625,000 credit bid as evidence of the fair market value of Unit 402. Rather, the district court used the credit bid only for purposes of calculating the deficiency, i.e., the difference between the sale amount and the total amount owing on the note at the time of the sale. AmWest was entitled to a judgment for the lesser of either that deficiency or the difference between the amount due and the fair market value of Unit 402, again evaluated at the time of the trustee's sale. *See* Utah Code Ann. § 57-1-32 (LexisNexis 2010);

---

6. We note that AmWest did not pursue a cross-appeal to challenge the district court's use of the whole-unit appraisal to calculate the fair market value of Kellin's seven-eighths interest in Unit 302.

*see also Black's Law Dictionary* 486 (9th ed. 2009) (defining "deficiency"). The district court's statement that Kellin was "entitled to the benefit of the greater amount" was a clear reference to the deficiency judgment statute that we cannot construe as a use of the credit bid to establish fair market value.

## VII. Attorney Fees

¶37 AmWest requests an award of its attorney fees incurred on appeal. "Generally, a party that received attorney fees below and prevails on appeal is entitled to fees reasonably incurred on appeal." *Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App 259, ¶ 25, 338 P.3d 825; *see also Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998). AmWest received an award of attorney fees below and has prevailed on appeal. We therefore award AmWest its reasonable attorney fees incurred on appeal.

## CONCLUSION

¶38 Kellin has failed to establish error arising from the district court's application of the burden of proof, its determination of highest and best use, its credibility determinations, its valuation of the two foreclosed interests, or its use of AmWest's credit bid on Unit 402 in calculating the deficiency judgment. We affirm the district court's deficiency judgment and remand this matter for a calculation of AmWest's reasonable attorney fees incurred on appeal.

———————