**2017 UT App 160**

# THE UTAH COURT OF APPEALS

SA GROUP PROPERTIES INC.,
*Appellee,*
*v.*
HIGHLAND MARKETPLACE LC, HIGH NOON LC, SOLANA BEACH
HOLDINGS LC, THOMAS A. HULBERT, AND BRET B. FOX,
*Appellants.*

Opinion
No. 20151046-CA
Filed August 24, 2017

Fourth District Court, Provo Department
The Honorable James R. Taylor
No. 120401312

James E. Magleby and Kennedy D. Nate, Attorneys
for Appellants

Steven T. Waterman and Nathan S. Seim, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES J. FREDERIC VOROS JR. and KATE A. TOOMEY concurred.[1]

MORTENSEN, Judge:

¶1     Highland Marketplace LC, High Noon LC, Solana Beach
Holdings LC, Thomas A. Hulbert, and Bret B. Fox (collectively,
Highland) invested in a land-development project that ran up
against the economic recession of 2008. Highland defaulted on
its multimillion-dollar loan, and SA Group Properties Inc. (SA
Group) foreclosed on Highland's investment property, an

---

1. Judge J. Frederic Voros Jr. participated in this case as a
member of the Utah Court of Appeals. He retired from the court
before this decision issued.

incomplete commercial development in Highland, Utah, just east of an area known as Silicon Slopes (the Property). The foreclosure sale price was less than the loan balance, leading to this deficiency action. After a bench trial, a judgment of almost $5,000,000 was entered against Highland. On appeal, Highland contends that the trial court erroneously denied its motion to amend its answer. Highland also contends that the court erred when it concluded that the fair market value of the Property was $10,568,000, essentially rejecting Highland's expert's opinion on the market value of the Property at the time of the foreclosure sale. We affirm.

BACKGROUND

¶2 Highland obtained a $28,000,000 loan, secured by the Property, from First Community Bank in September 2007. It used the loan to develop the Property, including connecting utilities, building roads and sidewalks, and constructing commercial buildings on several lots. Development eventually stalled and Highland defaulted on the loan. SA Group, as successor to First Community Bank, foreclosed on the Property.

¶3 At the time of foreclosure, Highland owed $14,685,370 on the loan. The foreclosure sale yielded $8,565,000. SA Group commenced this deficiency action[2] against Highland in August 2012.

---

2. Utah Code section 57-1-32 governs the process for obtaining a deficiency judgment against a debtor. The statute states,

> At any time within three months after any sale of property under a trust deed . . . an action may be commenced to recover the balance due upon the obligation for which the trust deed was given as security . . . . The court may not render judgment

(continued…)

¶4    In March 2014, Highland filed its second motion to amend seeking to extend fact discovery and to assert counterclaims against SA Group based on First Community Bank's alleged

---

(…continued)

> for more than the amount by which the amount of the indebtedness with interest, costs, and expenses of sale, including trustee's and attorney's fees, exceeds the fair market value of the property as of the date of the sale.

Utah Code Ann. § 57-1-32 (LexisNexis 2010). "In other words, when the proceeds from a trustee's sale do not completely satisfy the debt underlying a trust deed, section 57-1-32 allows the creditor to sue the debtor in an attempt to recover the amount remaining due on the note." *AmericanWest Bank v. Kellin*, 2015 UT App 300, ¶ 12, 364 P.3d 1055. The statute allows creditors to recover against debtors but also "is meant to prevent creditors from reaping a windfall by obtaining valuable trust deed property at a fraction of its fair market value while pursuing the debtor (or guarantor) for the full amount due on the underlying note." *Id.* ¶ 13 (citation and internal quotation marks omitted).

> Thus, in the ordinary deficiency action, it is in the creditor's interest to establish a low fair market value of the foreclosed property to avoid or minimize the effect of the statutory cap and obtain a judgment for as close as possible to the full amount of the deficiency. By contrast, the debtor has an incentive to show that the foreclosed property had a high fair market value, so as to minimize or even eliminate the creditor's deficiency judgment.

*Id.* ¶ 14.

failure to fund a draw request.[3] By this time, fact discovery had concluded and a motion for summary judgment filed by SA Group had been decided. However, no trial date had been set.

¶5     Although SA Group provided 29,000 pages of discovery in nine separate disclosures between April 2013 and February 2014, the proposed amended answer was purportedly based on five documents produced between April and September 2013. Other documents long in Highland's possession—the draw request, loan forms, and a 2010 email chain[4]—show that Highland was aware of the unfunded draw request prior to the commencement of the deficiency action.

¶6     The trial court denied the motion to amend, concluding that the motion to amend was "untimely based on [Highland's] previous knowledge of the failed draw requests and the completion of significant procedural stages in the case." The court also concluded that the delay in filing the motion to amend was not justified, due to Highland's long-held knowledge of the operative facts.

¶7     The trial court held a three-day bench trial in May and August 2015. The only issue at trial was the fair market value of the Property as of the foreclosure date. Three experts testified;

---

3. Highland filed an initial motion to amend in December 2013, which it withdrew in March 2014. That motion attempted to address unfunded draw requests as well.

4. The emails, dated between April 19 and 22 of 2010 are communications between Thomas Hulbert, a principal of Highland, and a representative at First Community Bank. The emails identify the unfunded draw request and discuss a general contractor's threat to put a lien on the Property and the need for Highland to pay delinquent property taxes prior to the bank processing the draw.

Kerry Jorgensen and Darrin Liddell testified for SA Group and Philip Cook testified for Highland. Jorgensen valued the Property at $10,568,000. Liddell valued the Property at $9,240,000. Cook valued the Property at $14,710,000. The trial court ultimately adopted Jorgensen's opinion and rejected the valuations of the other experts. The court entered a judgment against Highland for $4,747,891 plus attorney fees and costs.

¶8      The trial court referenced several reasons for its decision to reject Cook's valuation of the Property. First, it found that Cook ascribed too much value—$475,000—to a letter of intent from a restaurant chain, Jack in the Box (the Letter of Intent). The court noted that the Letter of Intent was "dated days prior to the foreclosure sale and was signed by Highland as the Landlord," even though Highland no longer owned the Property at the time.[5]

¶9      The trial court also found that Cook used unreliable facts and data in valuing one of the lots on the Property known as the Anchor Pad. The trial court based this conclusion on Cook's testimony that he valued the Anchor Pad as multi-unit housing because Highland "said [it was] going to do multi-family, and so [he] started down that road . . . [and] just sort of finished it on that basis." However, Cook also opined in a report that the multi-unit housing appraisal is in effect the same as a commercial property appraisal because "the value of the underlying land for commercial use is roughly the same as the value of the underlying land for multifamily use." Cook testified

---

5. The trial court also criticized Liddell's treatment of the Letter of Intent, saying, "The Court is of the view that the letter of intent would have added only marginal value [to] the property because [Highland] did not have title to the property included in the letter. Nevertheless, Mr. Liddell gave the circumstance no credence, at all." Jorgensen, whose testimony the trial court eventually adopted, assigned no value to the Letter of Intent.

at trial that he valued the Anchor Pad as commercial property, and Jorgensen testified that Cook "did it correctly for the anchors." The trial court determined that Cook's valuation was unreliable because he

> valued the "Anchor Pad" of [the Property] using the condition that the Anchor Pad would function as multi-family housing, even though, (1) [the Property] was not zoned for multi-family housing; (2) [the Property] was not equipped with a sewer system or other necessary infrastructure to handle multi-family housing; [(3)] Highland City has stated that it is against re-zoning the property; and (4) there is no indication, other than [Highland's] own statements to Mr. Cook, that Highland City was ever willing to [re-zone] the Highland Property for multi-family use.

¶10 In addition to Cook's valuation of the Anchor Pad, the trial court criticized Cook's appraisal of these and other lots for his use of assumed conditions. Those assumed conditions are

> (1) the relied-upon letter of intent would be executed and that a "Jack in the Box" would be constructed; (2) the zoning of the anchor pads would be changed; (3) a Walgreens would be timely constructed; (4) Pad I would be subdivided into two parcels; (5) the fitness club lease would be terminated; (6) the fitness space lease would be converted to retail space; and (7) the entire project would be leased to stabilized occupancy.

The trial court made these findings despite Jorgensen's testimony that he and Cook each assumed that Walgreens would be constructed and deducted costs to determine the actual value of the lease, the subdivision of Pad I was irrelevant to the

valuation,[6] and each expert performed a stabilized estimate to arrive at an "as is" appraisal value.

¶11    There was some discussion at trial about the methods the experts used to reach their valuations, especially whether Cook used the "land residual method."[7] Jorgensen conceded that Cook used "a slightly different technique" than the land residual method but explained that "what [Cook] used was still a land residual technique" and that "all land residual techniques . . . have that same problem." Jorgensen also conceded that this same critique of Cook's approach could be applied to his "incremental value enhancement" in the Walgreens lot.

¶12    Based on the above findings, the trial court determined that Cook's valuation was less reliable than the other experts' valuations. Specifically, the court found that Cook based his appraisal on unsupported and unreliable facts and data, used unestablished and unreliable methods to reach his valuation,

---

6. While Jorgensen agreed that the subdivision of Pad I was irrelevant, he explained, "My only complaint has been when you . . . hypothetically split it . . . and then come up with a value that's for two pieces that are greater than the value of the whole pad . . . it's a further extension of this problem that I keep talking about."

7. The trial court's finding on the land residual method states that the method "takes the projected future value of a hypothetical project on the land . . . and then deducts the costs of building the project to reach the value of the land. Courts have shown a clear disdain for this valuation methodology because small variations in the variables used can result in a dramatic change in the land value estimate." Highland has not challenged this finding, and we therefore have no occasion to question its accuracy.

and did not value the Property "as is." Accordingly, the trial court adopted Jorgensen's valuation.

ISSUES AND STANDARDS OF REVIEW

¶13   Highland presents two issues for our review. First, Highland contends that the trial court erred in denying its motion to amend its answer. We review a trial court's denial of leave to amend for an abuse of discretion. *Estrada v. Mendoza*, 2012 UT App 82, ¶ 19, 275 P.3d 1024. A trial court abuses its discretion if there is "no reasonable basis for the decision." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 16, 163 P.3d 615 (citation and internal quotation marks omitted).

¶14   Second, Highland contends that the trial court erred in concluding that the fair market value of the Property on the date of the foreclosure sale was no greater than $10,568,000, where its conclusion is based on the finding that Jorgensen gave a credible appraisal while Cook did not.

> Determinations regarding the weight to be given to the testimony of expert witnesses are within the province of the finder of fact, [and] we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them. Thus, we may reverse a trial court's credibility determination if its findings in support of that determination are clearly erroneous, that is, if they are against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made.

*AmericanWest Bank v. Kellin*, 2015 UT App 300, ¶ 25, 364 P.3d 1055 (citations and internal quotation marks omitted).

ANALYSIS

I. Motion to Amend

¶15    Highland argues that the trial court erred when it determined that the motion to amend was untimely and unjustified. Under rule 15(a) of the Utah Rules of Civil Procedure, parties may amend pleadings prior to trial. Utah R. Civ. P. 15(a). That rule exists to "allow parties to have their claims fully adjudicated." *Timm v. Dewsnup*, 851 P.2d 1178, 1183 (Utah 1993). Parties may amend a pleading "as a matter of course" where the amendment is filed within twenty-one days after serving it or, for pleadings to which a responsive pleading is required, within twenty-one days after service of the responsive pleading or twenty-one days after service of a motion under rule 12(b), (e), or (f), whichever is earlier. Utah R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the court's permission or the opposing party's written consent. . . . The court should freely give permission when justice requires." *Id.* R. 15(a)(2).

¶16    "When determining whether to grant or deny a motion to amend, a court may consider certain factors, including: (1) the timeliness of the motion; (2) the justification given by the movant for the delay; and (3) the resulting prejudice to the responding party." *Armer Texas Trust v. Brazell*, 2017 UT App 35, ¶ 11, 397 P.3d 604 (citation and internal quotation marks omitted). Highland claims the trial court abused its discretion when it determined that the motion to amend was untimely and unjustified.

¶17    "Utah appellate courts have consistently refused the invitation to establish a bright line rule regarding how far into the litigation process a motion to amend must be filed in order to be deemed untimely." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 28, 87 P.3d 734. Generally, a motion to amend is untimely when it is "filed in the advanced procedural stages of

the litigation process, such as after the completion of discovery, on the eve of a scheduled trial date, or after an order of dismissal has already been entered." *Id.* ¶ 29. A motion to amend is typically found untimely if it is "filed several years into the litigation." *Id.* ¶ 30.

¶18　Here, Highland filed its motion to amend in March 2014, a year and a half after the commencement of the case. By this time fact discovery was complete. Therefore, there is a factual basis for concluding that the motion was untimely and we cannot conclude under such circumstances that the trial court exceeded its discretion in denying the motion for this reason. Further, by the time Highland filed its motion, the case was advanced in its procedural progression, with the court having already denied a motion for summary judgment filed by SA Group and having dismissed affirmative defenses asserted by Highland. The passing of this procedural stage also supports the court's determination that the motion was not timely. Therefore, there was a "reasonable basis for the decision" to deny Highland's motion to amend. *See Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 16, 163 P.3d 615 (citation and internal quotation marks omitted).

¶19　To show justification for a delayed motion to amend, a party may demonstrate that the delay was not "due to a dilatory motive, a bad faith effort during the pleading process, or unreasonable neglect in terms of pleading preparation," or that the "party's prior knowledge" of the events prompting the amendment "was minimal" or "based on suspicious or inconclusive evidence." *Kelly*, 2004 UT App 44, ¶ 38.

¶20　The documents that Highland relied on for its proposed counterclaim were received no later than September 2013. There is also undisputed evidence in the record from emails, loan documents, and the draw request itself that Highland had actual knowledge of the events that supported the proposed amendment. Accordingly, the trial court could reasonably

conclude that Highland had more than minimal, speculative knowledge of the facts underlying the proposed amendment months prior to the close of fact discovery and many months prior to filing the motion. Thus, the record supports a determination that the delay in filing the motion to amend was unjustified, and we cannot conclude under such circumstances that the court exceeded its discretion in denying the motion on this basis. *See id.*

¶21 Highland argues that any delay in bringing the motion to amend was caused by SA Group's "failure to produce relevant documents until the eve of the close of fact discovery." Indeed, SA Group produced documents all the way up to February 2014 when fact discovery closed. However, Highland's argument ignores that the documents relevant to its proposed amendment were produced no later than September 2013 and that Highland had actual knowledge of the facts forming the basis of its amendment prior to the commencement of this action.

¶22 Because there is a reasonable basis to conclude that the motion was untimely and unjustified, we cannot conclude that the trial court exceeded its discretion. *See Tschaggeny*, 2007 UT 37, ¶ 16. Therefore, we affirm the denial of the motion to amend.

## II. The Trial Court's Findings and Conclusions

¶23 Highland argues that the trial court made erroneous and inconsistent findings—that its expert, Cook, was not credible and that SA Group's expert, Jorgensen, was credible—and that those errors warrant reversal. Highland does not challenge the admissibility of any of the expert testimony but instead takes issue with the weight the trial court gave the experts' opinions and the court's associated credibility determinations.

¶24 Attacking credibility and weight determinations of a fact finder, such as a judge in a bench trial, presents a significant hurdle for any appellant, particularly as it pertains to expert

witnesses. Because the weight to be given to the testimony is "within the province of the finder of fact, we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them." *Barrani v. Barrani*, 2014 UT App 204, ¶ 6, 334 P.3d 994; *accord AmericanWest Bank v. Kellin*, 2015 UT App 300, ¶ 25, 364 P.3d 1055; *Fullmer v. Fullmer*, 2015 UT App 60, ¶ 25, 347 P.3d 14. "In a bench trial or other proceeding in which the judge serves as fact finder, the court has considerable discretion to assign relative weight to the evidence before it," including "the right to minimize or even disregard certain evidence." *Poll v. Poll,* 2011 UT App 307, ¶ 9, 263 P.3d 534 (citation and internal quotation marks omitted). Indeed, the judge as fact finder "is in the best position to judge the credibility of witnesses and is free to disbelieve their testimony," *Ouk v. Ouk*, 2015 UT App 104, ¶ 14, 348 P.3d 751 (citation and internal quotation marks omitted), "even if that testimony comes from an expert witness," *Woodward v. LaFranca*, 2016 UT App 141, ¶ 13, 381 P.3d 1125. A trial court's finding of fact is erroneous when the finding "is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." *Covey v. Covey*, 2003 UT App 380, ¶ 17, 80 P.3d 553 (citation and internal quotation marks omitted). "When the evidence is susceptible to more than one interpretation, the [trial] court, as the fact finder, is to consider the evidence and has significant discretion to assign relative weight to the evidence before it." *Lohman v. Headley*, 2012 UT App 337, ¶ 9, 293 P.3d 380.

¶25    Attacking only the court's respective witness credibility determinations, Highland asks us to reverse the trial court's order on the fair market value of the Property. The court found that Jorgensen was more credible than Cook and adopted Jorgensen's valuation. We conclude that Highland has failed to demonstrate error in either the trial court's finding that Jorgensen was credible or its finding that Cook was not credible.

A. The Trial Court's Acceptance of Jorgensen's Appraisal

¶26　Highland asserts that the trial court's valuation was clearly erroneous because the court adopted Jorgensen's analysis and conclusion and, Highland maintains, Jorgensen's analysis was flawed. However, Highland has failed to carry its burden on appeal in demonstrating error in the trial court's finding that Jorgensen was credible.

> [A]n appellant who seeks to prevail in challenging the sufficiency of the evidence to support a factual finding or a verdict on appeal should follow the dictates of rule 24(a)(9), as a party who fails to identify and deal with supportive evidence will never persuade an appellate court to reverse under the deferential standard of review that applies to such issues.

*State v. Nielsen*, 2014 UT 10, ¶ 40, 326 P.3d 645. The Utah Supreme Court explained, "In *Nielsen*, we repudiated the hard-and-fast notion of dismissing a claim based solely on 'a technical deficiency in marshalling.'" *State v. Prater*, 2017 UT 13, ¶ 43 n.6, 392 P.3d 398 (quoting *Nielsen*, 2014 UT 10, ¶ 37). And after reiterating the principle stated above, the court further explained, "We focus on the 'question of whether the appellant has established a basis for overcoming the healthy dose of deference owed to . . . jury verdicts.'" *Id.* (omission in original) (quoting *Nielsen*, 2014 UT 10, ¶ 41). We, too, focus on the deference owed to the fact finder in this case.

¶27　Highland expends most of its energy attacking the trial court's treatment of Cook. In what little space it devotes to disputing the court's treatment of Jorgensen's opinion, Highland asserts that Jorgensen's opinion is not credible while making no effort "to identify and deal with supportive evidence." *See id.*

¶28 The trial court heard three days of evidence from three experts testifying on the single issue of the fair market value of the Property. Highland provided only a smattering of examples that it believes demonstrate that Jorgensen was not credible. Highland argues that "Jorgensen's appraisal is replete with conservatism" and adds, "some examples follow." Highland then argues that Jorgensen's valuation used downward adjustments in "the major factors that go into valuing a property," that Jorgensen used rents from outdated buildings to determine market rent, that Jorgensen valued a building more than a Walgreens lease, and that Jorgensen applied a twenty-five-percent discount to the Walgreens lease. Even if we agreed that the examples it provided were conservative, Highland ignores the rest of Jorgensen's appraisal. Highland's argument does not "persuade [us] to reverse under the deferential standard of review that applies" to the trial court's credibility determination because it "fails to identify and deal with supportive evidence." *See Nielsen*, 2014 UT 10, ¶ 40. This is because Highland's failure to identify supportive evidence does not give us a clear picture to determine whether the trial court's finding "is against the clear weight of the evidence." *See Covey v. Covey*, 2003 UT App 380, ¶ 17, 80 P.3d 553 (citation and internal quotation marks omitted). Highland does not attempt to highlight what evidence supports Jorgensen's opinion, let alone succeed in showing that the supporting evidence is so deficient that the adoption of Jorgensen's opinion is clearly erroneous.

¶29 What is more, the attack Highland does make against Jorgensen fails. Highland points to Jorgensen's use of older comparable properties in his appraisal and his use of, in Highland's view, unsupported and unreasonably conservative estimates in his analysis. In its findings, the trial court acknowledged "that the older shopping centers used in [Jorgensen's] appraisal as comparables were not only inferior in appearance, but also did not look as modern nor as good as [the Property]." However, the court concluded that "Jorgensen adequately compensated for these variations in computing the

'as is' market value of the property." By expressly considering the very contention that Highland brings on appeal, the trial court demonstrated that it "considered the evidence but weighed it differently" than Highland argues. *See Lohman v. Headley*, 2012 UT App 337, ¶ 8, 293 P.3d 380 (explaining that the court properly considered and weighed evidence where it did so expressly in its oral and written ruling). And because the weight to be given to the testimony is "within the province of the finder of fact, we will not second guess a court's decisions about evidentiary weight and credibility" because "there is a reasonable basis in the record to support them." *Barrani v. Barrani*, 2014 UT App 204, ¶ 6, 334 P.3d 994.

¶30 While Highland makes a compelling argument why a trial court might have questioned Jorgensen's approach, Highland fails to show that adopting a valuation based on "conservative choices" was clearly erroneous. The findings of the trial court demonstrate that it considered Highland's arguments but in the end found Jorgensen's valuation to be the most compelling. And because we cannot conclude that the court's subsidiary findings were clearly erroneous, the ultimate finding of fair market value is supported by the evidence and well within the trial court's discretion. Accordingly, Highland fails to carry its burden on appeal to show that the court's determination of fair market value was clearly erroneous.

B.     The Trial Court's Rejection of Cook's Appraisal

¶31 The trial court found that Cook's valuation of the Property was less credible than the valuations of the other experts. It listed three reasons for making this finding: (1) Cook's valuation was "based on unsupported and unreliable facts and data"; (2) Cook's valuation was "based on un-established and unreliable valuation [methods]"; and (3) Cook did not value the Property "in its 'as is' condition as of the . . . foreclosure date." Any one of these reasons would be sufficient to find that Cook lacked credibility.

¶32 In support of its finding that Cook's valuation used unsupported and unreliable facts, the trial court explained that Cook gave too much value to the Letter of Intent. Highland argues this was clearly erroneous because the trial court found that the Letter of Intent, signed by Highland as landlord when Highland no longer owned the Property, warranted marginal value, and that Jorgensen and Liddell both assigned the Letter of Intent no value. But this argument does not demonstrate that the trial court's credibility determination was clearly erroneous. The court decided, as the finder of fact, that assigning a value of $475,000 to the Letter of Intent made Cook less credible than the other experts who assigned the Letter of Intent no value at all. Although it is admittedly inconsistent for the trial court to criticize Liddell for assigning the Letter of Intent no value and to not criticize Jorgensen for doing the same thing, this inconsistency does not demonstrate that, in the trial court's "significant discretion to assign relative weight to the evidence before it," *see Lohman*, 2012 UT App 337, ¶ 9, it was against the clear weight of the evidence to find Cook even less credible for valuing the Letter of Intent at $475,000. There is a reasonable basis to conclude that Cook lacked credibility for overvaluing the Letter of Intent. Therefore, the court's finding on Cook's credibility is not clearly erroneous. *See AmericanWest Bank v. Kellin*, 2015 UT App 300, ¶ 25, 364 P.3d 1055; *see also id.* ¶¶ 27–28 (explaining that the trial court was not required to disregard an expert's testimony altogether where it found issues with parts of that expert's testimony).

¶33 No extrinsic evidence was presented on the absolute value of the Letter of Intent. Instead, each expert explained why he did or did not assign value to it. In determining what weight to give competing experts, "[f]act finders are not required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in the light of their experience as to the natural inclinations of human beings." *M.K. v. Doyle*, 2014 UT App 160, ¶ 7, 330 P.3d 1278 (citation, and internal quotation marks

omitted). A reasonable fact finder could conclude that a promise executed by a party with no authority to make the promise is no promise at all. The Letter of Intent illustrates what potential investment the lot could support, but that illustration goes only so far. Given that the Letter of Intent was signed by Highland—as landlord—when it no longer owned the land, the trial court concluded that it provided only marginal value. In the trial court's view, Cook's nearly half-million-dollar valuation was not marginal. And given Highland's incentive to show that the foreclosed property had a high fair market value, *see supra* ¶ 3 note 2, and the fact that the Letter of Intent was signed just days before the foreclosure sale, a reasonable fact finder could conclude that the Letter of Intent was essentially a ploy and an attempt to manufacture evidence to artificially inflate any market value analysis. This finding alone demonstrates a "reasonable basis in the record to support" the trial court's finding that Cook was not credible, and thus the trial court's credibility determination is not "clearly erroneous." *See AmericanWest Bank*, 2015 UT App 300, ¶ 25 (citations and internal quotation marks omitted).

¶34     Of course, the trial court did not rest its determination of Cook's credibility solely on his valuation of the Letter of Intent. The trial court relied on several other factors that are reasonably supported by the record and weigh against Cook's credibility. The court explained that Cook valued the Anchor Pad relying on the assumption that it would function as multi-unit housing, an assumption the trial court found unreasonable. The court found that this unsubstantiated assumption demonstrated that Cook's valuation was based on unsupported and unreliable facts. Highland argues that the trial court committed clear error by relying on this finding.

¶35     Highland points out that Cook and Jorgensen testified that Cook correctly appraised the Anchor Pad. However, Cook also testified that he valued the property as multi-unit housing, saying that he "started down that road . . . [and] just sort of

finished it on that basis." At best, the evidence here is conflicting, and finding one way or the other is within the trial court's discretion and not against the clear weight of the evidence. *See Lohman v. Headley*, 2012 UT App 337, ¶ 9, 293 P.3d 380 ("When the evidence is susceptible to more than one interpretation, the [trial] court, as the fact finder, is to consider the evidence and has significant discretion to assign relative weight to the evidence before it."). It is not error for the trial court to criticize Cook for this conclusion where the Anchor Pad was not equipped for, nor was there any indication from Highland City that the Anchor Pad would ever be zoned for, multi-unit housing. Therefore, we are not convinced that this finding was against the clear weight of the evidence or that a mistake was made.

¶36    Highland argues that the trial court erred in finding that Cook used a land residual technique in his valuation. We disagree. The trial court's finding rested, in part, upon Jorgensen's testimony that Cook used the land residual technique. However, Highland ignores the full context of this testimony. Jorgensen testified on cross-examination that Cook used "a slightly different technique" than the land residual technique and that Jorgensen used the same methodology of valuing the Walgreens lot. Jorgensen characterized the technique Cook used as "still a land residual technique," and explained that "all land residual techniques . . . have that same problem." It was therefore the general approach and its failings that undermined the trial court's confidence in Cook's analysis. Again, "[w]hen the evidence is susceptible to more than one interpretation, the [trial] court, as the fact finder, is to consider the evidence and has significant discretion to assign relative weight to the evidence before it." *Id.* In light of this testimony, we see no clear error in finding that, even if the technique Cook used was slightly different from a traditional land residual technique, the method was a type of land residual technique. And while Highland makes much of Jorgensen's concession that the same critique could be applied to his "incremental value

enhancement" in the Walgreens lot, the trial court has "significant discretion to assign relative weight to the evidence before it," *id.* It is not against the clear weight of the evidence to find that Cook's valuation of the Property was overall less credible than Jorgensen's valuation. Instead, this is a classic case of a fact finder determining the relative weight to give competing expert testimony.

¶37 Lastly, the trial court examined several assumptions Cook relied on and concluded that he did not appraise the Property "as is." We have reviewed the record and conclude that, in great part, evidence exists to support the trial court's findings. The assumptions criticized by the trial court are

> (1) the relied-upon letter of intent would be executed and that a "Jack in the Box" would be constructed; (2) the zoning of the anchor pads would be changed; (3) a Walgreens would be timely constructed; (4) Pad I would be subdivided into two parcels; (5) the fitness club lease would be terminated; (6) the fitness space lease would be converted to retail space; and (7) the entire project would be leased to stabilized occupancy.

¶38 It is important to note that Highland does not rebut in any meaningful way on appeal the assumptions numbered (1), (5), and (6). The trial court's finding that the Letter of Intent would be executed and that a Jack in the Box would be constructed is only rebutted by Highland's argument that "evidence irrefutably establishes that the [Letter of Intent] had already been executed." This argument ignores that the finding criticized Cook's assumption that the Letter of Intent would be acted upon and the restaurant would be constructed. For the reasons previously outlined, there was ample reason to believe that the Letter of Intent was essentially a ploy and an attempt to manufacture evidence to artificially inflate any market value analysis. Highland similarly fails to rebut the trial court's findings that

Cook assumed unreasonably that "the fitness club lease would be terminated" and that "the fitness space lease would be converted to retail space." Appellate courts "may accept unchallenged findings of fact as true." *See Bel Courtyard Invs., Inc. v. Wolfe*, 2013 UT App 217, ¶ 23, 310 P.3d 747. These findings stand unchallenged and weigh in favor of the trial court's ultimate determination that Cook's appraisal was unreliable.

¶39 Assumption (2), the Anchor Pad's zoning status, has already been discussed. *See supra* ¶ 35. We decided that the trial court's findings were not against the clear weight of the evidence in concluding that Cook lacked credibility in treating the Anchor Pad as a multi-unit development. That analysis applies here and also weighs in favor of the court's determination that Cook's appraisal was not "as is."

¶40 Continuing, assumptions (3) and (4) are reasonably open to criticism. Assumption (3)—that the Walgreens would be completed—was adequately explained away by the trial court. The court did not necessarily doubt that Walgreens intended ultimately to build, but the court took issue with Cook assuming that the store would be completed "as of the effective date of the appraisal." There was no direct evidence that this would occur, and the trial court could, and apparently did, conclude that Cook's assumption in this regard was unreasonably optimistic. As for assumption (4)—that Pad I would be subdivided—the court had a basis to conclude that Pad I had value, but that since it was not subdivided, to assume a subdivision would occur would artificially inflate the valuation. *See supra* ¶ 10 and note 6. Where Jorgensen testified that one should not assume the subdivision and where Cook testified that one could make that assumption, the trial court as fact finder was within its discretion to adopt the reasoning of one expert over another.

¶41 This leaves assumption (7)—that "the entire project would be leased to stabilized occupancy." It appears that all experts assumed the entire project would eventually be leased to

stable occupancy. Therefore, as to this single finding the trial court may have erred in rejecting this assumption.[8] But in light of the overwhelming findings supported by the evidence, we cannot conclude that this single assumption would have induced the trial court to adopt Cook's valuation instead of Jorgensen's. The conclusion remains: the record contains an adequate basis for the trial court to determine that Cook's valuation lacked credibility and was less reliable than Jorgensen's valuation. Again, the trial court "has significant discretion to assign relative weight to the evidence before it," *Lohman v. Headley*, 2012 UT App 337, ¶ 9, 293 P.3d 380, and we cannot say that the trial court's findings are against the clear weight of the evidence.

CONCLUSION

¶42 We conclude that the trial court did not err when it determined that Highland's motion to amend was untimely and unjustified. We further conclude that the trial court did not err when it rejected Highland's expert's opinion and instead adopted SA Group's expert's opinion on the fair market value of the Property. There is a reasonable basis in the evidence to support the trial court's findings, and thus the findings were not clearly erroneous.

¶43 Affirmed.

––––––––––

8. Although it is also plausible that the trial court believed all experts were wrong in this regard.