2025 UT App 62

THE UTAH COURT OF APPEALS

SUNRISE HOME HEALTH & HOSPICE, LLC,
Appellant,
*v.*
KATRINA NYE; OHANA HOME HEALTH AND HOSPICE, LLC;
MICHAEL R. LOFGRAN; HUNTSMAN & LOFGRAN, PLLC; HUNTSMAN
& LOFGRAN HOLDINGS, LLC; CAMI LIN; STEVE LIN; BRETT HADLEY;
AND THE CUTTING EDGE INVESTMENTS, LLC,
Appellees.

Opinion
No. 20230359-CA
Filed May 1, 2025

Third District Court, Salt Lake Department
The Honorable Kent R. Holmberg
No. 150904881

Troy L. Booher, Beth E. Kennedy, and Taylor P.
Webb, Attorneys for Appellant

Patrick C. Burt, Chelsey E. Phippen, and Devin H.
Geier, Attorneys for Appellees Ohana Home Health
and Hospice, LLC; Michael R. Lofgran; Huntsman
& Lofgran, PLLC; and Huntsman & Lofgran
Holdings, LLC

Ryan B. Frazier and Zachary C. Lindley, Attorneys
for Appellees Cami Lin, Steve Lin, Brett Hadley, and
The Cutting Edge Investments, LLC

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1     Katrina Nye worked as the Nursing Director and
Taylorsville Branch Manager of Sunrise Home Health & Hospice,

LLC (Sunrise). As a condition of her employment, she signed agreements that included non-competition and non-solicitation provisions. Despite signing these agreements, Nye proceeded to start her own company, Ohana Home Health and Hospice, LLC (Ohana), with the assistance of Michael Lofgran, Steve Lin (Steve),[1] and The Cutting Edge Investments, LLC (Cutting Edge). The district court found that Nye breached her contracts with Sunrise and that she, Lofgran, Steve, Cutting Edge, and Ohana were jointly liable to Sunrise for civil conspiracy and tortious interference. The district court awarded damages of $32,491.

¶2     Sunrise argues on appeal that the district court erred in determining the amount of damages and in dismissing its claims against defendants Cami Lin (Cami), Brett Hadley, and Huntsman & Lofgran, PLLC (the Firm).[2] We affirm the district court's decision.

BACKGROUND

*Nye's Employment with Sunrise*

¶3     Nye began working for Sunrise, a home health and hospice service, in November 2011. She was hired as the Director of Nursing and Branch Manager for its Taylorsville branch. At the start of her employment, she signed Sunrise's standard Employment Agreement (the Employment Agreement), which included provisions addressing company property,

---

1. Because Steve's wife, Cami Lin, is also a defendant in this case, to avoid confusion, we refer to Steve and Cami Lin by their first names, intending no disrespect in doing so.

2. Huntsman & Lofgran Holdings, LLC was dismissed at trial at the same time as Cami, Hadley, and the Firm. Sunrise has not contested its dismissal on appeal.

confidentiality, and non-solicitation. In 2013, Nye signed three additional agreements related to an incentive and bonus program. The Appreciation Rights Agreement (the AR Agreement) contained a noncompete provision that supplemented the obligations of the Employment Agreement. The Bonus Agreement (the Bonus Agreement) provided for discretionary bonuses. As per the Bonus Agreement, Nye received bonuses of $10,000 almost every quarter, totaling around $100,000. At the same time she signed the Bonus Agreement, Nye also signed "a separate noncompete, confidentiality, and non-solicitation agreement" (the Noncompete Agreement) by which Nye agreed not to compete with Sunrise for one year if she left the company and reiterated her promise not to solicit patients or employees.

¶4 While working at Sunrise, Nye began to have issues with her taxes related to the withholdings from her paychecks. In March 2015, Nye reached out to Lofgran, a tax attorney at the Firm, for legal advice and assistance in resolving her tax issues.

*Ohana Is Formed*

¶5 After resolving the tax issues with Lofgran's assistance, Nye wanted to leave Sunrise and went back to the Firm to have an attorney review the Employment Agreement, the AR Agreement, the Bonus Agreement, and the Noncompete Agreement to see what her options were in terms of other employment. She met with a litigation attorney at the Firm around March 19, 2015. The attorney talked broadly with Nye about her options, ultimately advising her that she could potentially get out of her agreements but not without the chance of litigation.

¶6 In mid-April, Nye and Lofgran discussed setting up a new home health agency where Nye would provide her nursing expertise and Lofgran would set up any business entities needed and provide general legal counsel to the organization.

¶7     After the initial discussion about creating what would come to be Ohana, Nye sent Lofgran an email that included "a rough summary of [Sunrise's] income and patient numbers." These reports showed "the number of admissions and referrals for [each month of] 2012, 2013, 2014, 2015" that Nye obtained from Sunrise's password-protected computer system, DeVero, which maintained Sunrise's confidential electronic medical records. Nye was one of three employees who had the necessary password for DeVero at any given time, apart from Matt Baker, Sunrise's Chief Executive Officer, and his wife. Nye gave this information to Lofgran despite promising not to disclose the information in her agreements and not receiving permission to do so.

*Disintegration of Nye's Relationship with Sunrise*

¶8     Around the same time, Baker heard rumors that Nye was considering breaching her noncompete agreements. Nye denied the rumors. On April 21, 2015, Nye was placed on administrative leave after Baker continued to hear that Nye was soliciting Sunrise's patients and employees. While on leave, Nye put together a business plan for Ohana and emailed the plan to Lofgran. Sunrise terminated Nye for cause on April 28, 2015.

¶9     Also in April, Lofgran reached out to Steve, his friend and a client of the Firm, to see if Cutting Edge would be interested in investing in Ohana. Steve was the point of contact for Cutting Edge; his wife, Cami, was a member of Cutting Edge along with Hadley. According to Steve, he and Cami were "one and the same" for business purposes and his practice was to pass all the information he learned about potential investments to Cami and Hadley so they could make informed business decisions. Steve did not forward any patient information to Cami or Hadley, and neither Cami nor Hadley ever met or had contact with Nye. Lofgran forwarded Nye's business plan to Steve along with the financial projection numbers Nye had sent him, which included additional patient and financial information.

*Ohana Secures Funding and Begins Operation*

¶10    In early June 2015, Nye sent Lofgran an email entitled "Potential Patients," which listed twenty-five patients from "Sunrise's confidential patient list, with revenue generated by each patient, cost associated with each patient, and each patient's type of care." All patients were individuals that Nye either cared for directly or for whom she supervised care. The revenue and cost numbers were so close to Sunrise's actual financial numbers that "they could not have been deduced without having access (at least through another employee) to Sunrise's financial data." Further, the patient care information could have only "been deduced by knowing what care the patients were actually receiving at Sunrise, as recorded in their respective diagnoses and care plans on their electronic medical record stored in DeVero." Lofgran passed this information on to Steve. Both Lofgran and Steve recognized that the information they were sharing was sensitive and confidential.

¶11    Lofgran then created Sour Candy, LLC (Sour Candy) with his law partner Diana Huntsman for the sole purpose of "acquiring an interest in Ohana." Ultimately, Sour Candy invested $10,000 in Ohana and was entitled to a 49% interest in the company.

¶12    The bulk of Ohana's funding came from Cutting Edge, which invested $30,000. Lofgran, Steve, and Nye met at the Firm in late April to discuss raising the necessary capital for Ohana. At some point during or before the meeting, Lofgran told Steve about the noncompete agreements. Steve "understood that the noncompete agreements prevented Nye from competing with or doing harm to Sunrise." Though Steve knew about the noncompete agreements, Cami testified that she was unaware of them and that Steve had not told her about them. Hadley, on the other hand, testified that he did know about the noncompete agreements, but that Lofgran told him that it was a "non-issue."

¶13 Acting as legal counsel for Ohana, Lofgran prepared its articles of organization and its operating agreement. The operating agreement intentionally left out Nye and listed only Cutting Edge and Sour Candy as its members due to concerns that Sunrise would take legal action against Nye for violating the noncompete and non-solicitation terms of her agreements. Nye, Lofgran, and Steve all understood that Nye would be added to the operating agreement to reflect her ownership and involvement once the legal problems had been resolved. Lofgran also left Nye's name off all publicly filed documents he prepared for Ohana, including its Medicare provider application, its business license application, and its articles of organization.

¶14 Ultimately, Ohana was a short-lived venture. It opened its doors on July 10, 2015, and saw its first patient on July 13, 2015. Eight patients were officially admitted, all of whom were former Sunrise patients. Several additional Sunrise patients were in the process of being admitted to Ohana, but Ohana shut down two weeks later after Sunrise filed a lawsuit and obtained a temporary restraining order against Ohana. During its fourteen days of operation, Ohana generated no income and had not yet qualified for Medicare reimbursement.

*Other Events Impacting Sunrise's Business*

¶15 Contemporaneously with Nye's departure from Sunrise and the creation of Ohana, Humana Health Insurance Company (Humana) ended its contract with Sunrise. Sunrise patients were informed on June 18, 2015, that Sunrise would cease to be a participating provider with Humana at the start of August 2015.

¶16 In addition to changing companies for reasons of insurance coverage, patients would often change companies to stay with their healthcare provider, as that personal relationship was paramount. And the home health and hospice industry in Utah was particularly competitive during this time, with

approximately forty such companies operating along the Wasatch Front.

¶17 Sunrise shut down in July 2017 after the state revoked its business license and the Federal Bureau of Investigation seized Sunrise's computers and business documents. Baker was ultimately charged with and pled guilty to federal healthcare fraud. He was sentenced to twelve months and one day in prison and ordered to pay $94,968.08 in restitution.

*The Bench Trial*

¶18 In December 2021, the court held a bench trial on the claims brought by Sunrise against Nye, Lofgran, Ohana, Cutting Edge, Steve, Cami, Hadley, and the Firm.[3] During the trial, Sunrise called an expert witness (Sunrise's Expert) to testify to damages incurred by Sunrise due to the actions of the defendants. Sunrise's Expert testified that Sunrise suffered $584,211.05 in lost profit damages. He used the "historical revenue per day" for each patient until the end of 2016 to calculate the lost profit damages for each patient.

¶19 In contrast, defendants' expert witness (Defendants' Expert) testified that Sunrise only suffered zero to $32,491 in lost profit damages. He used the same historical revenue per day for each patient but used an average length of stay of 180 days based on his discussions with Nye—who knew the patients and told him that she felt that the 180-day timeframe was a reasonable estimate—to calculate lost profit damages attributable to each patient. He then reduced the lost profit damages by 75% based on Baker's testimony about the cancellation of the Humana contract. Baker's testimony at issue is as follows:

---

3. The complaint named several other defendants who were later dismissed and whose dismissal is not before us on appeal.

Q. How many patients did you have that were on Humana right before this cancelation in April— April of 2015 to be clear?

A. I believe, roughly, we had somewhere in the range of 20 to 30.

Q. 20 to 30. And how many of those have you actually lost as a result—well , how many of those have you lost?

A. That are no longer receiving services from Sunrise?

Q. Correct.

A. As a percentage or—

Q. Percentage would be fine.

A. Probably roughly 75 percent of those.

Q. Has that loss affected Sunrise's profitability?

A. It has.

¶20    Sunrise's Expert testified that he understood Baker to be saying that those Humana patients left in large part because of the defendants' actions, not that Sunrise lost 75% of the patients because Humana ended its contract. Defendants' Expert, in contrast, testified that it was "very clear" to him that Baker meant that patients left Sunrise due to the end of the Humana contract, as Baker made no reference to Nye in his testimony.

¶21    At the conclusion of the bench trial, the district court found that Nye breached her agreements with Sunrise by (1) violating her promise not to disclose confidential information in the

Employment Agreement, (2) breaching her promise made in the Employment Agreement and Noncompete Agreement not to solicit patients and employees, and (3) breaching her promise not to compete with Sunrise in the AR agreement and Noncompete Agreement. The district court also found that Sunrise suffered lost profit damages of which Nye was the proximate cause. The district court adopted Defendants' Expert's view of damages and awarded $32,491.

¶22 Regarding the other defendants, the district court concluded that Nye, Lofgran, Ohana, Steve, and Cutting Edge were jointly and severally liable to Sunrise for committing civil conspiracy and tortious interference in the same amount of $32,491. It dismissed Sunrise's claims against Cami and Hadley because Sunrise did not meet its burden of proof in demonstrating by clear and convincing evidence that they were part of the conspiracy. The district court also dismissed Sunrise's vicarious liability claim against the Firm, finding that Sunrise did not demonstrate that Lofgran was acting as an agent of the Firm. The district court awarded Sunrise "a joint and several judgment" in the amount of $32,491.

*Post-trial Motion to Alter or Amend the Judgment*

¶23 Sunrise filed a post-trial motion to alter or amend the judgment, arguing that the district court erred in calculating the damages award based on 180-day average stays and in reducing the damages by 75% due to the loss of the Humana contract. It further argued that the court erred in dismissing Sunrise's claims against Cami, Hadley, and the Firm. The district court denied the motion.

ISSUES AND STANDARDS OF REVIEW

¶24 Sunrise raises several challenges to the district court's damages award. "Whether the amount awarded by the district court was supported by the evidence is a determination of fact that may be reversed on appeal only if clearly erroneous." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 42, 516 P.3d 306 (cleaned up).

¶25 Sunrise also challenges the district court's dismissal of the conspiracy claims against the Firm and Cutting Edge members Cami and Hadley under rule 52(e) of the Utah Rules of Civil Procedure, which presents a mixed question of law and fact. "[W]e review a district court's interpretation and application of our rules of civil procedure for correctness." *Sanders v. Sanders*, 2021 UT App 122, ¶ 4, 502 P.3d 1230. However, when an appellant challenges a district court's underlying factual findings in making a legal determination, "we will not disturb the court's findings of fact unless they are clearly erroneous." *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 13, 288 P.3d 1046 (cleaned up).

ANALYSIS

I. Damages

¶26 Sunrise argues that the "district court erred in calculating Sunrise's lost profits damages . . . by relying on reductions imposed by" Defendants' Expert that were not "supported by the evidence." Specifically, Sunrise asserts that the district court erred in (1) reducing Sunrise's claimed damages based on a 180-day average stay calculation, (2) reducing Sunrise's claimed damages by 75%, and (3) failing to include in the damages calculation the patients that left Sunrise for Ohana but did not receive care from Ohana.

¶27 In a bench trial where the district court serves as fact finder, "the court has considerable discretion to assign relative weight to the evidence before it, including the right to minimize or even disregard certain evidence." *SA Group Props. Inc. v. Highland Marketplace LC*, 2017 UT App 160, ¶ 24, 424 P.3d 187 (cleaned up). Indeed, the district court "is in the best position to judge the credibility of witnesses and is free to disbelieve their testimony, even if that testimony comes from an expert witness." *Id.* (cleaned up).

> Attacking [the] credibility and weight determinations of a fact finder, such as a judge in a bench trial, presents a significant hurdle for any appellant, particularly as it pertains to expert witnesses. Because the weight to be given to the testimony is within the province of the finder of fact, we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them.

*Id.* (cleaned up). And if there is more than one possible interpretation of the evidence, the district court "has significant discretion to assign relative weight to the evidence before it." *Id.* (cleaned up). As explained below, we see no clear error by the district court in calculating Sunrise's damages.

A.    180-Day Average Stay

¶28 Sunrise argues that the district court clearly erred in adopting Defendants' Expert's assumption that patients would have stayed at Sunrise for 180 days because 180 days is the industry average for hospice patients, not home health patients. Sunrise notes that the patients who left Sunrise had chronic conditions that would require care for the rest of their lives and that using a 180-day average was unnecessary given that "it was undisputed that two of the patients died in 2016, and that the

other nine remained alive" at the end of 2016, when Sunrise's Expert ended his analysis. Sunrise further asserts that the "record was clear" that the patients who left Sunrise for Ohana "were home long-term care patients, not hospice patients." Sunrise thus argues that the district court should have adopted Sunrise's Expert's view that the proper calculation of damages was the lifetime of the patients. But the evidence before the district court on this issue was not as clear as Sunrise claims.

¶29 First, there was no actual data on how long these particular patients would have stayed with Sunrise because they all left to join Nye at Ohana. And Sunrise acknowledges that there was no evidence presented about Sunrise's historical averages for a patient's length of stay. Because no party presented such evidence, it was up to the district court to "choose between experts as to relative credibility" and to believe or "disbelieve all the expert testimony placed before it—provided it can articulate a reasonable basis for doing so." *Woodward v. Lafranca*, 2016 UT App 141, ¶ 13, 381 P.3d 1125 (cleaned up).

¶30 The district court found numerous problems with the opinion of Sunrise's Expert, including his "failure to account for intervening factors" that may have impacted Sunrise's profits such as the termination of the Humana contract, Baker's conviction for healthcare fraud, and Sunrise's forced closure. The district court also found that the opinion of Sunrise's Expert that the patients would have had an "indefinite length of stay" until their death was both "unreasonable and without sufficient support." In contrast, the district court did not find the same credibility issues with Defendants' Expert's testimony. It found that Defendants' Expert's position on calculating an average length of stay was "well supported" by the evidence.

¶31 Though Sunrise argues that Defendants' Expert was mistaken because he got the 180-day time frame from the industry average for hospice patients and not home health patients, the

record does not support this contention. The district court noted that Defendants' Expert based his 180-day estimate on Nye's opinion about these particular patients and on "his general knowledge of the home health industry." In fact, Defendants' Expert was clear in response to Sunrise's questions that his use of 180 days was not based on it being a hospice industry standard:

> Q. And despite that you based your 180 days on an average of hospice and home health care patients as well as what Ms. Nye was telling you?
>
> A. *No, it wasn't based on hospice.* I looked to that as a reasonableness check but Ms. Nye, for these patients, said 180 days would be a reasonable figure to use.
>
> Q. Okay, I must have misunderstood your previous testimony that you were relying on hospice numbers. Let me ask you, you applied this 180-day number to each of these patients, correct?
>
> A. Yes, I did.
>
> Q. And I assume your rationale for that is the same, that this is either what you gathered from the industry or what Ms. Nye had told you?
>
> A. Yes.

(Emphasis added.)

¶32 Ultimately, the district court was presented with two different methods for calculating damages offered by competing experts. Because Sunrise did not present any historical averages for the length of stay for any of its patients, the experts necessarily had to rely on other information to quantify the financial impact of the departure of these particular patients. Sunrise's Expert

assumed that these patients would have remained at Sunrise until their deaths (many years later) had Nye not recruited them away to Ohana. Defendants' Expert, on the other hand, relied upon Nye's own assessment that a 180-day average was reasonable for these particular patients and that this time frame was in line with his assessment of the industry.

¶33 It was thus within the district court's discretion to determine which expert was more credible and which time frame—the patients' life spans or 180 days—was more in line with the evidence before it. "We will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them." *SA Group Props. Inc. v. Highland Marketplace LC*, 2017 UT App 160, ¶ 24, 424 P.3d 187 (cleaned up). Here, the district court had no historical average length of stay to consider, there was evidence before the court that the home health and hospice industry in Utah was particularly competitive and that patients often changed companies to stay with their healthcare provider, and Nye identified 180 days as reasonable for these patients. Thus, the district court's reduction of Sunrise's damages based on a 180-day calculation as the average length of stay was not clearly erroneous.

B.     Reduction of Damages by 75%

¶34 Sunrise argues that the district court clearly erred in reducing Sunrise's lost profits by 75% based on Defendants' Expert's "assumption that 75% of the patients who left with Nye would have left, regardless of Nye's conduct, because Sunrise was losing its contract with Humana." According to Sunrise, there was "no evidence to support that assumption." We disagree.

¶35 Defendants' Expert formed his opinion by relying on the testimony provided by Baker about the impact on Sunrise of the loss of the Humana contract. Baker testified that "roughly 75 percent" of the Humana patients were no longer receiving

services from Sunrise. Sunrise's Expert interpreted Baker's testimony differently, understanding Baker to attribute the loss of 75% of the Human patients to Nye's recruitment of those patients to Ohana. "When the evidence is susceptible to more than one interpretation, the [district] court, as the fact finder, is to consider the evidence and has significant discretion to assign relative weight to the evidence before it." *See SA Group Props. Inc.*, 2017 UT App 160, ¶ 24 (cleaned up)). Thus, the district court was free to consider for itself what Baker's testimony meant and it was also free to believe or disbelieve the conflicting expert views of Baker's testimony.

¶36 Therefore, the district court's decision to agree with and follow Defendants' Expert's interpretation of Baker's testimony to mean that Sunrise lost 75% of the Humana patients due to the Humana contract—and to reduce the damages accordingly—was not clearly erroneous.

C. Additional Patients

¶37 Finally, Sunrise argues the district court clearly erred in its damages calculation by not including the patients who left Sunrise for Ohana but never received care from Ohana.[4] We agree with appellees that this issue was not properly preserved for appeal.

¶38 For an issue to be preserved for appeal, the parties must "have raised and argued before the district court the issue that they raise and argue before us on appeal, and if a party does not, it has failed to preserve the issue." *True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 23, 427 P.3d 338 (cleaned up). An issue is only

---

4. There appears to be some confusion in the record as to how many patients actually left Sunrise for Ohana but did not receive care from Ohana. Because we find this issue is unpreserved, we need not resolve this discrepancy.

preserved for appeal if it "has been presented to the [district] court in such a way that the [district] court has an opportunity to rule on it." *Id.* ¶ 24 (cleaned up). The district court "has the opportunity to rule [on an issue] if the following three requirements are met: (1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority." *Searle v. Searle*, 2001 UT App 367, ¶ 17, 38 P.3d 307 (cleaned up).

¶39     In its opening brief, Sunrise argued that it preserved the issue of the additional patients both in its post-trial motion to alter or amend the judgment and at trial. However, in its post-trial motion, Sunrise presented only two arguments: (1) the district court erred by limiting the damages to a 180-day period and (2) the district court erred by reducing damages by 75% due to the loss of the Humana contract. When appellees pointed out this omission, Sunrise conceded in its reply brief that the additional patient issue was not raised in the post-trial motion. But Sunrise maintained that it raised the issue at trial and therefore it has been preserved. Specifically, Sunrise argued that it preserved the issue by presenting it to the district court in its proposed findings of fact and conclusions of law (submitted in lieu of closing arguments), and, thus, that it was "squarely before the court at trial." And, in Sunrise's view, because it raised the issue in its proposed findings, it did not need to raise the issue in its post-trial motion because "preservation does not require a preserved issue to be reasserted in a post-trial motion."

¶40     In support of this reasoning, Sunrise cites *Clark v. Clark*, 2023 UT App 111, 537 P.3d 633. In *Clark*, this court noted that when "the district court direct[s] the parties to submit proposed findings of fact and conclusions of law in lieu of closing arguments," an argument made there is "preserved for our review." *Id.* ¶ 36 n.3. However, even though an argument can be preserved if presented to the district court in proposed findings of fact and conclusions of law, the legal argument must still be

presented to the district court in such a way that it can rule on it. *See Searle*, 2001 UT App 367, ¶ 17. Sunrise did not do so here.

¶41 The only mention Sunrise made in its proposed findings of fact regarding this issue was that Defendants' Expert's "own opinion on damages is fundamentally flawed at the outset, because he includes only five patients in his analysis, despite purportedly relying on Nye's deposition, which acknowledges nine Sunrise patients that were either admitted at Ohana or attempted to be admitted." And in its proposed conclusions of law, Sunrise included only a single paragraph on damages that adopted its own expert's opinion in full, which included damages for "11 patients."

¶42 Sunrise did not make any legal argument regarding why Defendants' Expert's reliance on five patients instead of nine patients was improper. It merely outlined a factual difference between Sunrise's Expert's opinion and Defendants' Expert's opinion, which does not equate to preserving a distinct legal issue. This is especially true when considering that the bulk of the 50 proposed findings of fact on damages focused on whether 180 days was the proper measure of damages and the effect of the loss of the Humana contract, while only a single paragraph noted that Defendants' Expert relied upon a lesser number of patients. Thus, this one proposed factual finding (out of a total of 295) was not enough for the district court to know it was being specifically asked to rule on the legal issue of whether the patients who left for Ohana but did not receive care from Ohana should be included in the damages calculation. *See id.*

¶43 Accordingly, Sunrise did not raise with the district court the legal issue it now raises on appeal—that the damages did not account for the patients who left Sunrise for Ohana but did not receive care from Ohana because their enrollment was still in process when Ohana shut down. Because this issue was not

presented to the district court, it was not preserved for appeal and we do not address it.

## II. Dismissal of Civil Conspiracy Claims

¶44 Sunrise argues that the district court erred in dismissing its civil conspiracy claims against the Firm, Cami, and Hadley under rule 52(e) of the Utah Rules of Civil Procedure. But because we affirm the district court's ruling on damages, we do not need to reach the dismissals of the conspiracy claims as the issues are now moot.

¶45 At the end of the trial, the district court found that Nye, Ohana, Lofgran, Steve, and Cutting Edge were jointly and severally liable to Sunrise for $32,491. Sunrise asks us to reverse the district court's dismissal of claims against three additional defendants and impose liability on them. But doing so would not alter the ultimate judgment in the case because even if the Firm, Cami, and Hadley were also liable to Sunrise, all the defendants would remain jointly and severally liable. And the fact that only joint and several liability would be incurred by these three defendants is inconsequential as concerns Sunrise because the judgment has already been paid in full.

¶46 Although this precise issue has not been addressed in Utah, we find the Idaho Supreme Court's holding on a similar issue compelling. In *Stephen v. Sallaz & Gatewood, Chartered*, 248 P.3d 1256 (Idaho 2011), the district court had found a law firm and one of its attorneys liable for malpractice, while finding the other attorney sued was not liable. *Id.* at 1259. On appeal, the appellant argued that the other attorney was personally liable for malpractice as well. *Id.* at 1263. In response to this argument, the Idaho Supreme Court held that because the appellant had already been paid the full amount of the judgment below, "any ruling on this issue would have no practical effect" and therefore the issue was moot. *Id.* Such is the case here. A judicial determination that

the Firm, Cami, and Hadley are liable for conspiracy "would have no practical effect upon the outcome because the judgment has already been paid and satisfied." *Id.* (cleaned up). Thus, we decline to address this issue as it is moot.[5]

CONCLUSION

¶47 We detect no clear error on the part of the district court in calculating the amount of damages, and Sunrise failed to preserve its challenge to the district court's determination of the number of patients to include in the damages calculation. We conclude that the dismissal of the civil conspiracy claims against the Firm, Cami, and Hadley is moot. Thus, we affirm the district court's decision.

———————

5. Sunrise also argues that it is entitled to attorney fees in connection with this appeal. Because Sunrise does not prevail in its appeal, we do not award it attorney fees.